Francisco Levy, demandante recurrente y recurrido, *v.* Autoridad de Edificios Públicos, demandada recurrente y recurrida.

*Números:* RE-89-661
RE-89-650
RE-89-656

*Resueltos:* 15 de marzo de 1994

*Mariano Canales Delgado*, de *Canales Lara Offices*, abogado de la recurrente Autoridad de Edificios Públicos; *Antonio Moreda-Toledo, Manuel Moreda*, de *Moreda R. Moreda*, y *Roberto L. Córdova*, abogados del recurrente Francisco Levy; *Roberto Lefranc Romero* y *Marilys Burgos Márquez*, de *Martínez Álvarez, Hernández Padí, Menéndez Monroig, Menéndez Cortada & Lefranc Romero*, abogados del *amicus curiae*.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

La industria de la construcción, tanto privada como gubernamental, ha sido medular en nuestro desarrollo económico y social. Más que cláusulas frías, sus contratos de obra se traducen en empleos y salarios que toman formas arquitectónicas en viviendas, escuelas, hospitales, centros comunales y otros.

Estos recursos nos permiten armonizar las facultades y prerrogativas concedidas por una cláusula contractual, que autoriza al dueño de una obra de construcción a ordenar cambios, con los derechos del contratista.

I

A mediados de 1972, el Departamento de Transportación y Obras Públicas adjudicó las subastas para la construcción de los hospitales regionales de *Humacao y Arecibo* a Francisco Levy, Hijo, Inc. (en adelante Levy). El 21 de agosto de 1972 se otorgó el contrato de *Humacao*, mediante el cual Levy realizaría la obra en un plazo de setecientos veinte (720) días calendario, por la suma de ocho millones doscientos sesenta y cinco mil dólares ($8,265,000). El de *Arecibo* se firmó el 22 de septiembre y Levy lo construiría en novecientos (900) días calendario, a un costo de doce millones seiscientos cincuenta y nueve mil dólares ($12,659,000). Ambos contratos fueron cedidos posteriormente a la Autoridad de Edificios Públicos (en adelante la Autoridad).

Los contratos incorporaron unas cláusulas que autorizaban, previa notificación a Levy, modificaciones, conocidas en el argot de la industria de la construcción como *órdenes de cambio* (*change orders*). Este tipo de órdenes puede emitirse "bien para reducir o incrementar la construcción, ello conllevando reducción o incremento en el precio y ajustes porcentuales en las partidas de gastos fijos y ganancia,

esto último conocido en la industria como 'overhead and profit' ".(¹) Caso Núm. RE-89-650, Parte I, Apéndice, *Exhibit* 2, pág. 2.

La construcción en *Humacao* comenzó el 18 de septiembre de 1972 y debía terminar el 7 de septiembre de 1974. La Autoridad dio veintidós (22) órdenes de cambio,(²) que enmendaron los términos contractuales relativos al tiempo, las obras y el costo. En específico, el tiempo se extendió en seiscientos treinta (630) días, es decir un 87.5%, y aumentaron el costo en trescientos cuarenta y nueve mil catorce dólares con veinte centavos ($349,014.20), equivalente a 4.22%. Levy nunca cuestionó las extensiones de tiempo ni el valor asignado, aunque cursó dos (2) comunicaciones escritas expresando que su aceptación a las condiciones de las órdenes de cambio no implicaban una renuncia a una compensación adicional justa y razonable. La construcción del hospital de *Humacao* estuvo sustancialmente terminada para el 28 de mayo de 1976, pero no fue hasta ciento treinta y tres (133) días más tarde, es decir, el 8 de octubre, cuando fue entregada.

Levy reclamó el perjuicio monetario debido al aumento

---

(¹) Sentencia parcial del Tribunal Superior, Sala de San Juan (Hon. Guillermo Arbona Lago, Juez).

(²) La Cláusula 9.1.4 de las *Condiciones Especiales del Contrato* (*Special Provisions*) dispone que la orden de cambio es escrita y dirigida al contratista y emitida por el dueño e ingeniero, luego de haber suscrito el contrato. Puede utilizarse para autorizar un cambio en la obra o un ajuste en la suma contractual durante la vigencia del contrato.

En inglés, su texto íntegro dispone:

"A change order is a written order to the Contractor signed by the Owner and the Engineer, issued after the execution of the Contract. Authorizing a change in the work or an adjustment in the contract sum in the contract time. *The contract sum and the contract time may be changed only by change order.*" Caso Núm. RE-89-650, Parte I, Apéndice, *Exhibit* 12, pág. 95.

Sobre estas veintidós (22) órdenes de cambio, el ilustrado tribunal de instancia correctamente sintetizó:

"La número 3 le concedió 48 días calendario de tiempo de obra para compensarle por igual número de días perdidos por lluvia y huelga del subcontratista mecánico. Los números 4, 17 y 20 meramente contemplan paralización de la obra por 289 días por razón de cambios en el diseño interesados por el Estado. Todas los demás responden a órdenes aditivas de obra por un monto de $349,014.20 y 283 días." Caso Núm. RE-89-650, Parte I, Apéndice, *Exhibit* 2, págs. 3–4.

en los gastos fijos generales empresariales, tanto en su oficina principal como en el proyecto, resumidos del modo siguiente:

> a. 283 días calendario para realizar obra adicional en la suma de $349,014.20[;] b. 289 días calendario de paralización de obra sin verificar trabajo, por razón de cambio en los planos (rediseño) [;] c. 133 días transcurridos entre la sustancial o virtual terminación ('substantial completion') de la obra y la entrega final del edificio y facilidades a la Autoridad de Edificios Públicos. Caso Núm. RE-89-650, Parte I, Apéndice, *Exhibit* 2, pág. 4.

Según lo indicado, el contrato de construcción del Hospital Regional de *Arecibo* fue firmado el 22 de septiembre de 1972. Como consecuencia de las diversas órdenes de cambio, se extendió setecientos sesenta y nueve (769) días adicionales a los novecientos (900) pactados originalmente. Estas órdenes comprendieron:

> (1) [R]equerimiento de obra adicional, (2) órdenes de paralización total de obra para proceder a [red]iseñar etapas de la construcción y (3) extensión de permanencia en la obra luego de su terminación substancial debido a que el Departamento de Salud no se encontraba preparado para aceptar y empezar a operar el hospital. Como cuarta partida el demandante reclama el pago del retenido, sus intereses, gastos específicos así como compensación por el costo operacional general que tal retraso causó en su organización industrial, conocido por "extended overhead, home office and job site". Caso Núm. RE-89-650, Parte I, Apéndice, *Exhibit* 2, págs. 15–16.

La Autoridad rechazó la solicitud de compensación adicional.

Ante esa negativa, Levy la demandó. Luego de consolidar en San Juan ambos casos,[3] el ilustrado tribunal, mediante una sentencia parcial elaborada, delineó los perfiles generales comunes de ambas obras, susceptibles de ser re-

---

[3] En el caso del hospital de *Humacao*, conforme la Regla 41 de Procedimiento Civil, 32 L.P.R.A. Ap. III, se designó Comisionado Especial al Lcdo. Edwin Bonilla Vélez.

sumidos así: los contratos se componen de documentos similares; durante su ejecución se emitieron numerosas órdenes de cambio que aumentaron el costo y tiempo pactado, y las extensiones de tiempo concedidas por la Autoridad surgieron como consecuencia de errores en el diseño y tardanzas en la toma de decisiones por causas *no* imputables a Levy. Resolvió que "[e]l precio y el tiempo originalmente pactado son consideraciones esenciales del contrato de construcción y sólo pueden ser alteradas mediante orden de cambio". Caso Núm. RE-89-650, Parte I, Apéndice, *Exhibit* 2, pág. 18.

El tribunal tomó conocimiento judicial de que en Puerto Rico regularmente el término de un proyecto de construcción se extiende para subsanar situaciones no previstas en la etapa de proyección y planos. Como determinación crucial concluyó que, debido a la magnitud y complejidad operacional de las obras, Levy debió haber calculado en su cotización una extensión de tiempo de 25% por concepto de cambios aditivos y 20% por órdenes de paralización.

Con vista a estos parámetros, tomó como fundamento los setecientos veinte (720) días calendario de la obra de *Humacao* y determinó que Levy debió haber anticipado que podía extenderse hasta ciento ochenta (180) días calendario por la nueva labor requerida, y ciento cuarenta y cuatro (144) días calendario, por motivo de las órdenes de paralización. Estimó que la extensión de tiempo hasta esos límites estaba dentro del marco de previsibilidad y no procedía la compensación adicional. No obstante, señaló que los gastos fijos e indirectos (*Job Site and Central Office Overhead*) en los que incurrió Levy, como consecuencia de una extensión de tiempo superior a la equivalente a los porcientos arriba mencionados, *eran compensables*.[4]

Aplicó igual normativa a la obra de *Arecibo* y aclaró que

---

[4] El término en exceso que el tribunal de instancia consideró previsible asciende a ciento tres (103) días calendario por obras aditivas y a ciento cuarenta y cinco (145) días calendario por motivo de órdenes de paralización de obra.

quedaba por "determinar el número exacto de días calendario sobre el cual se verificará el cómputo". Caso Núm. RE-89-650, Parte 1, Apéndice, *Exhibit* 2, pág. 13. Pospuso para una vista evidenciaria posterior lo relativo a los ciento treinta y tres (133) días transcurridos entre las fechas de terminación sustancial y entrega final del proyecto de *Humacao*. En ésta también escrutaría los días de retraso entre la terminación sustancial y la entrega final de la obra de *Arecibo*.

Finalmente, consignó su criterio que, aunque el licitador se reservó en los contratos el derecho a emitir órdenes de cambio, su ejercicio tenía que estar enmarcado dentro de los parámetros de la buena fe contractual, por lo que no podía interrumpir el plan de trabajo del contratista más allá de lo previsible. En este contexto, visualizó la previsibilidad con referencia a los por cientos mencionados, que correspondían a las obras aditivas y paralizaciones. A juicio suyo, toda interrupción que excediera el ámbito de previsibilidad constituía un incumplimiento contractual.

A solicitudes separadas de ambas partes, revisamos.[5]

---

[5] Levy presentó dos (2) recursos. Respecto a *Humacao*, imputa seis (6) errores, mientras que el relacionado con *Arecibo*, cuatro (4). Los cuatro (4) errores coinciden en ambos recursos. Son:

"(1) El Tribunal Superior cometió grave error de derecho al tomar conocimiento judicial de que el tiempo contractualmente pactado para la construcción de una obra se extiende durante su ejecución para subsanar situaciones imprevistas en su etapa de proyección y planos.

"(2) El Tribunal Superior cometió grave error de derecho al concluir que el momento de licitar un contratista prudente debe preveer los atrasos que pueda sufrir la obra a construirse como resultado de posibles cambios aditivos o suspensiones parciales por rediseño, razón por la cual debe de incluir en su licitación una partida de dinero para cubrir los costos y gastos indirectos que debió preveer al momento de licitar.

"(3) El Tribunal Superior cometió grave error de derecho al concluir que una obra de la magnitud, complejidad y localización de la que nos ocupa, la demandante-recurrente en su cotización calculó o debió calcular una extensión de tiempo debido a cambios aditivos, en el orden de un 25% del tiempo originalmente pactado y en cuanto a los atrasos causados por paralizaciones parciales de las obras de construcción debió preveer que el tiempo originalmente pactado se veía extendido en un 20%.

"(4) El Tribunal Superior cometió un grave error de derecho al concluir que los porcentajes antes mencionados en el anterior señalamiento deben deducirse de la totalidad del tiempo que la obra se vio atrasada por causas imputables al dueño."

## II

Por su importancia decisoria, reproducimos la premisa medular que animó al foro de instancia:

19. Debemos y tomamos conocimiento judicial que de ordinario en Puerto Rico el término de una obra se extiende durante su ejecución para subsanar situaciones imprevistas en su etapa de proyección y planos. A tal efecto el Dueño extiende al Contratista Ordenes de Cambio ("change orders"). Entendemos que el Contratista promedio que cotiza para subastas de obra pública o privada toma en consideración la realidad fáctica en la industria al verificar los cálculos de su cotización al amparo de los pliegos y planos de la subasta. Por tanto, tenemos que concluir que a falta de cláusula específica en contrario en el contrato de obra, el contratista promedio dejó para su momento la valoración del costo directo de cualquier orden de cambio aditiva, que ahora nos ocupa, pero previno una partida prudente de costos indirectos ("Job-site overhead", "Central Office Overhead" o "Home Office Overhead") en anticipación a que estas extensiones en el término de obra aparecerían con sus consecuentes retrasos en la obra. No podemos concluir lo contrario de un experimentado licitador y constructor de obra. Entendemos que el demandante en su cotización calculó o debió calcular para estas obras, atendida su magnitud y complejidad operacional, una extensión de tiempo debido a cambios aditivos de obra en el orden de un 25% y de un 20% en posibles órdenes de paralización (órdenes de cambio requiriendo solamente suspensión de obra) por cualquier causa, sea por necesidad de rediseño, aceptación tardía, etc. Aún y cuando causa mayor (huelga, lluvia, etc.) podría precipitar una situación de "rebus sic stantibus" ante otro cuadro fáctico, no se contempla aquí como cambio contractual de término de obra computable dentro de dicha partida de veinte por ciento (20%) y así lo aceptan, de mutuo acuerdo, los litigantes. Caso Núm. RE-89-650, Parte I, Apéndice, *Exhibit* 2, págs. 19–20.

Ciertamente, retrasos en el tiempo pactado originalmente en este tipo de obras son comunes en la industria de la construcción. "Las partes deben anticipar (no esperar) retrasos y contemplarlos en el contrato." (Traducción nuestra.) B.B. Bramble y M.T. Callahan, *Construction De-*

Caso Núm. CE-89-650, Parte I, Solicitud de revisión o *certiorari*, págs. 8–9.

*lay Claims*, Nueva York, Ed. John Wiley & Sons, 1987, Sec. 2.1, pág. 14. "Los contratos de construcción están sujetos a muchos retrasos, por innumerables razones, y por los cuales la culpa podría ser difícil de adjudicar .... Los retrasos son generalmente previstos como probables; y los riesgos, por consiguiente, son descartados." (Traducción nuestra.) 3A *Corbin on Contracts* Sec. 720, pág. 377 (1960).

Aún así, Levy nos ha remitido con frecuencia a la Cláusula 8.7 de las Condiciones Generales, dispositiva que el tiempo es un elemento esencial. El tribunal coincidió con esa apreciación y concluyó que el retraso constituyó un incumplimiento. La diferencia estriba, sin embargo, que mientras el tribunal lo configuró de ese modo únicamente cuando la demora excedía ciertos límites de previsibilidad, Levy insiste en descartar ese factor, lo concibe sin límites y nos afirma que "en el contrato entre las partes no hay nada establecido para previsibilidad, pues el tiempo es la esencia del contrato". No tiene razón.

▮ Reafirmamos los pronunciamientos de *Unisys v. Ramallo Brothers*, 128 D.P.R. 842 (1991), a los efectos de que determinar la intención de las partes exige tomar en consideración no sólo los contratos, "sino también la práctica de mercadeo en la industria, los actos de los contratantes anteriores, coetáneos y posteriores y quiénes son las partes, *haciendo particular hincapié en el conocimiento especializado que todos o algunos de ellos pudieran tener sobre la materia objeto del contrato*". (Énfasis suplido.)

Si extendemos esos pronunciamientos al contrato de construcción, es ineludible dictaminar que el contratista, por su conocimiento especializado, debió prever los retrasos. Como cuestión contractual, no podía ignorar que la Cláusula 9.1.4. y las órdenes de cambio podían alterar el tiempo. El propio perito de Levy, Ing. Ulises Barros Lo-

ubriel, se expresó en esos términos, aunque limitó su criterio a un máximo de cinco por ciento (5%).[6]

Así aclarado, es imperativo concluir que ello no sólo afectó el término original de ejecución, sino la cláusula expositiva de que el tiempo es esencial. Su inclusión revela el interés de cumplir con el tiempo pactado, pero que fuera compatible con una extensión en el tiempo de activarse la cláusula sobre las órdenes de cambio. "Es poco probable que la sola presencia o ausencia de una cláusula que diga que 'el tiempo es de la esencia del contrato' sea el factor decisivo, pues los tribunales tienden a mirar otras circunstancias y lenguaje del contrato al buscar determinar el efecto a dar a una fecha de terminación (completion date)." (Traducción nuestra.) S.G.M. Stein, *Construction Law*, Nueva york, Ed. Matthew Bender, 1991, Vol. 2, Sec. 6.07.

■ No erró, pues, el tribunal sentenciador al resolver que el tiempo pactado originalmente para la construcción de una obra se puede extender para cubrir situaciones imprevistas en la etapa de proyección y planos. Esa práctica quedó implícitamente reconocida cuando se estipularon las cláusulas de órdenes de cambio, según aceptado por el perito de Levy. Ello derrota su segundo planteamiento, a saber, haber el tribunal de instancia concluido que al momento de la licitación "un contratista prudente debe prever los atrasos que pueda sufrir la obra a construirse como resultado de posibles cambios aditivos o suspensiones par-

---

[6] "P. Ahora el máximo. El máximo de la complejidad de la construcción, pues no debe ser nunca más de un cinco, de un máximo de un cinco.

"R. Yo diría que sí, Yo diría ...

"P. Por eso.

"R. Sigo insistiendo en que un proyecto bien concebido ...

"P. Bien concebido.

"R. ... por profesionales responsables, por profesionales pasando juicio sobre ese proyecto, como es el caso de la Autoridad de Edificios Públicos ...

"P. Sí.

"R. ... y en especial, digamos, un hospital, en que se han hecho otros hospitales similares, básicamente, a éste, en que se dispone de experiencia en este tipo de construcción no ... no hay por qué anticipar cambios de más de un dos o un tres por ciento, máximo un cinco por ciento." T.E., pág. 23.

ciales por rediseño". Solicitud de revisión o *certiorari*, pág. 8.

## III

■ En su tercer señalamiento, Levy ataca los por cientos de previsibilidad de extensión de tiempo en casos de obras aditivas y paralizaciones. Es justo consignar que en cuanto a la tardanza, de la cual se queja Levy, surge de la emisión de órdenes de cambio en una cantidad que considera irrazonable. Y ciertamente, "[e]l contratista es acreedor a daños por retrasos cuando el dueño emite órdenes de cambio excesivos o irrazonables más allá de aquellas contempladas por las partes en el contrato". (Traducción nuestra.) *Construction and Design Law*, Virginia, National Institute of Construction Law, 1991, Vol. II, Cap. 8, Sec. 8.4, pág. 30.

En el caso de autos, los contratos no estipularon cantidad ni condiciones que deban revestir las órdenes de cambio a los efectos de determinar su razonabilidad.[7] El tribunal de instancia expresó que "[s]i bien el dueño se reservó el derecho a expedir órdenes de cambio, ese derecho no puede interrumpir más allá de lo previsible y razonable la secuencia ordenada de los trabajos del contratista. Si así lo hace, incurre en un incumplimiento de contrato que la mera compensación en tiempo no repara totalmente". Caso Núm. RE-89-650, Parte I, Apéndice, *Exhibit* 2, págs. 26–27. La laguna contractual lo obligó a fijar la fórmula de compensación.[8] Se fundamentó en el prin-

---

[7] La Cláusula 4.3 de las Condiciones Generales del Contrato no limita la cantidad de órdenes de cambio que pueden emitirse durante la ejecución de la obra para aumentar o disminuir la cantidad de trabajo. Dispone que dicho derecho se ejercerá "como pueda resultar necesario o deseable para completar la propuesta construcción en forma satisfactoria y el contratista llevará a cabo el trabajo de acuerdo con los planes cambiados". (Traducción nuestra.) Caso Núm. RE-89-650, Parte I, Apéndice, *Exhibit* 13, pág. 1.

[8] Refiriéndose a la obra de *Humacao*, en sus determinaciones el tribunal de instancia expresó:

cipio de la buena fe en el cumplimiento de las obligaciones consagrado en el Art. 1210 del Código Civil, 31 L.P.R.A. sec. 3375,(⁹) y además, en A.G. Spota, en su *Tratado de Locación de Obra*, 3ra ed.:

> Diremos, conforme al nuevo artículo 1198 que los contratos deben prepararse, celebrarse, cumplirse y además interpretarse con buena fe y que, con esas directivas no sólo debe reembolsarse al empresario los costos y beneficios industriales inherentes al trabajo imprevisible, *sino también los mayores costos imprevisibles de trabajos previstos.* (Énfasis suplido.) Spota, *op. cit.*, pág. 527.

Precisamente, derivado de la ausencia de buena fe exhibida por la demandada Autoridad al emitir un número excesivo de órdenes de cambio, se configura un incumplimiento de contrato. No erró el tribunal sentenciador al enunciar unos por cientos de previsibilidad y que el tiempo en exceso del período constituido por el plazo pactado originalmente, más el tiempo adicional que era previsible, constituyeron un incumplimiento de contrato. Veamos.

■ *Primero*, independientemente de qué por ciento de tiempo era previsible y, por ende, parte integrante del contrato, en algún punto la demora provocada por las numerosas órdenes de cambió *resultó irrazonable*. Hemos visto que contractualmente el tiempo era un elemento esencial.

---

"... entendemos y así concluimos que el demandante contratista debió prever que la misma podría extenderse dentro del ámbito contractual que concede al dueño la prerrogativa de efectuar 'change orders' pagando sólo por costo real de materiales, mano de obra y un 10% a 15% para gastos generales y ganancia ('overhead and profit') directos e inmediatos a esa labor nueva requerida, por un término adicional de hasta 180 días calendario (720 × .25 = 180) y por motivos de órdenes de paralización de obra solicitada por el dueño de hasta 144 días calendario (720 × .20 = 144). Consecuentemente el demandante tiene derecho a que el exceso de 103 [sic] días calendario respectivos, para un total de 248 días calendario, de prolongación de obra extraordinaria se le compensen y reembolsen en cuanto a los gastos fijos e indirectos ('Job site and central office overhead') a que en esta sentencia nos referimos." Caso Núm. RE-89-650, Parte I, Apéndice, *Exhibit* 2, pág. 20.

(⁹) "Los contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todos las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley." 31 L.P.R.A. sec. 3375.

En *Ramírez v. Club Cala de Palmas*, 123 D.P.R. 339, 347–348 (1989), indicamos que "no todo incumplimiento de una obligación recíproca conlleva efectos resolutorios. Para que así sea, es menester que la obligación incumplida sea una *esencial* o que su cumplimiento constituya el motivo del contrato para la otra parte". (Énfasis en el original.)

■ El Art. 1054 del Código Civil, 31 L.P.R.A. sec. 3018, establece la concesión de daños y perjuicios a cualquiera de los contratantes afectados por el dolo, negligencia o morosidad de quien incumple. A su amparo, Levy sostiene que "el tiempo adicional que un Contratista razonable puede prever ... sólo tiene relevancia a los fines de determinar si hubo incumplimiento de contrato", y si se determina que lo hubo, entonces el dueño viene obligado a indemnizar *todos* los daños sufridos por el Contratista como resultado del incumplimiento. Caso Núm. RE-89-650, Parte I, Solicitud de revisión o *certiorari*, pág. 16. Tampoco tiene razón.

■ El propio Código Civil, en su Art. 1057 (31 L.P.R.A. sec. 3021), preceptúa que:

> La culpa o negligencia del deudor consiste en la omisión de *aquella diligencia que exija la naturaleza de la obligación y corresponda a las circunstancias de las personas, del tiempo y del lugar.*
> Cuando la obligación no exprese la diligencia que ha de prestarse en su cumplimiento, se exigirá la que correspondería a un buen padre de familia. (Énfasis suplido.)

Evidentemente, en el caso de autos, la negligencia del deudor no se configura automáticamente al finalizar el tiempo pactado originalmente. La naturaleza de la obligación requiere laxitud en el tiempo dentro de unos parámetros. Ya hemos visto que el propio perito de Levy admitió que unas extensiones de tiempo de 2%, 3% y hasta un 5%, en un contrato de construcción, eran previsibles y debían ser tomadas en cuenta por un contratista prudente al licitar.

# IV

¿Quién fija los parámetros de previsibilidad? ¿En qué se fundamenta el ejercicio de esa discreción? Levy sostiene que los por cientos de previsibilidad señalados por el tribunal de instancia son arbitrarios, especulativos y "tiene[n] el efecto de extender, *por fiat* judicial, el tiempo contractualmente pactado, a los fines de determinar los costos y gastos indirectos incurridos por el Contratista cuando es atrasado en un proyecto por causas que no le son imputables y que sí caen bajo el control del Dueño". (Énfasis suplido.) Caso Núm. RE-89-650, Parte I, Solicitud de revisión o *certiorari*, págs. 13–14.

Reiteramos que la buena fe permea los contratos de construcción; por lo tanto, si una parte incumple al faltar a la buena fe contractual, el tribunal puede incluso anular el contrato. No obstante,

> [e]n casos apropiados, no habrá de llegarse a la aniquilación de la libertad contractual, recurriendo a la alternativa de *revisabilidad* del contrato, un concepto intermedio situado entre los dos polos de la validez y de la nulidad, cuyo núcleo es la sustitución parcial de la voluntad privada por la voluntad estatal y que preserva la eficacia esencial del negocio. M. Royo Martínez, *Transformación del concepto del contrato en el derecho moderno*, 177 Rev. Gen. Legis. Juris. 113–157 y ss. (1945). F. Puig Peña, *Compendio de Derecho Civil Español*, 3ra. ed., Madrid, Eds. Pirámide, 1976, T. 3, pág. 338 y ss.
>
> [A fin de cuentas, los tribunales estamos facultados] para atemperar la irracionalidad de la causa cuando ésta hiere el principio de la reciprocidad de las prestaciones y la norma de buena fe del citado Art. 1210. (Énfasis en el original.) *Util. Cons. Servs. v. Mun. de San Juan*, 115 D.P.R. 88, 90 (1984).

En el ejercicio de esta prerrogativa judicial, el tribunal de instancia fijó los por cientos de previsibilidad. Su actuación respondió, además, a la ruta alterna trazada en el Art. 1081 del Código Civil, 31 L.P.R.A. sec. 3064, que dispone:

> Si la obligación no señalare plazo, pero de su naturaleza y

circunstancias se dedujere que ha querido concederse al deudor, los tribunales fijarán la duración de aquél.

También fijarán los tribunales la duración del plazo cuando éste haya quedado a voluntad del deudor.

Aunque ciertamente aquí la obligación tenía un plazo —y proveía para las órdenes de cambio— *no se delimitó el tiempo que podía extenderse el contrato original debido a dichas órdenes de cambio.* Judicialmente podía fijarse uno razonable pues, como señaló el tribunal sentenciador, la orden de cambio "se funde con el contrato original".

Tampoco procede el argumento de Levy en cuanto a que los por cientos son arbitrarios y especulativos. El Ing. Rafael Dávila Siaca, perito de la Autoridad, fue sumamente orientador. Fundó su criterio en un estudio de demoras en dieciocho (18) proyectos públicos, rodeados de circunstancias análogas a las de autos. Atestó:

> El total combinado a base de la realidad en proyectos públicos, de estos 18 proyectos públicos, serían de un 48.8, porque este por ciento incluye días de lluvia, huelga, paralizaciones parciales, incluye todo. Este por ciento que aparece en la penúltima columna, antes de llegar a la columna del contratista, pues ese porciento de tiempo adicional incluye todo el tiempo adicional del proyecto. O sea, que incluye paralizaciones parciales, incluye días de lluvia, huelga, etcétera, y eso ... ese promedio dentro ... O sea, 48.8, en mi apreciación, está dentro de los parámetros que estableció el Tribunal a los efectos de asignar un 25% promedio de tiempo adicional por concepto de trabajo adicional, más un 20% de tiempo adicional por concepto de paralizaciones parciales, pues ese total es 45, pues ese total de 45, que el Honorable Tribunal ha sugerido, pues compara favorablemente con el promedio .... T.E., pág. 76.

Aparte de esos dieciocho (18) proyectos públicos, el perito Dávila Siaca evaluó y comparó siete (7) hospitales construidos en Puerto Rico en cuanto el tiempo pactado, el requerido para terminarlos y, además, el costo original y el resultante, que al final arrojó un tiempo adicional de 40.4% Más aún, abarcó quince (15) proyectos de complejidad similar, entre los cuales destacó penitenciarías, centros del

Gobierno, centros judiciales, superintendencia de la Policía; lo cual reveló un promedio de tiempo adicional al convenido ascendente a 53.84%

Contrario al testimonio documentado del ingeniero Dávila Siaca, el perito de Levy —ingeniero Barros Loubriel— aunque respetable, descansó en su experiencia sin fundamentarla en resultados *concretos*. Declaró:

> P: Bien. Ahora le pregunto al testigo, si eso está basado en la] práctica de la experiencia de la construcción, ¿cómo se define o cómo podemos llegar a qué es la práctica de la construcción? Porque la práctica de la construcción es un concepto etéreo, eso tiene que estar respaldado por cierta experiencia. De manera que, ¿cuál es la experiencia de la práctica de la construcción, con hechos específicos en que el Honorable Juez pueda descansar para admitir que es el dos, es el tres, es el cinco o es el cincuenta o el cien por ciento? ¿Cuáles son esos factores que establecen la práctica de la construcción?
>
> R: Pues esa es la experiencia que yo he tenido en los últimos treinta y cinco años y los textos que he estudiado, sí. T.E., pág. 25.

Estamos persuadidos de la validez de los *estudios específicos* del ingeniero Dávila Siaca.

Levy argumenta que la interpretación del tribunal de instancia está reñida con la realidad de la industria de la construcción. Aduce que "[n]ingún contratista puede asumir esos gastos sin ir a la quiebra. Tendría que pasarlos al dueño en su licitación y por tanto se aumentaría el costo de la construcción en Puerto Rico en un 25%". Caso Núm. RE-89-650, Parte I, Solicitud de revisión o *certiorari*, pág. 15. *No nos convence*. Su argumento parte de la premisa de que el juez sentenciador tenía el conocimiento judicial de que los por cientos ya indicados son razonables en cualesquiera situaciones análogas a las del caso de autos. Notamos, sin embargo, que dicho foro encontró razonables esos por cientos *dentro* del contrato específico y los hechos del caso. Circunscribió su conocimiento judicial a "que de ordinario, en Puerto Rico el término de ... una obra se extiende durante

su ejecución para subsanar situaciones imprevistas en su etapa de proyección y planos". Íd., pág. 10.

La preocupación de Levy, en cuanto que los por cientos determinados podrían tener consecuencias nefastas para la industria, pasa por alto las diferencias en los hechos. Ni el tribunal de instancia como tampoco nosotros pretendemos establecer una regla general; repetimos, cada caso presenta sus peculiaridades y se resolverá individualmente. *Más importante aún, la cuestión puede dejar de ser materia de adjudicación judicial, pues nada impide que sea objeto de estipulación en los contratos.*

En el recurso referente al Hospital de *Humacao*, Levy también cuestiona la expresión de que "[t]odo lo relativo a los 133 días calendario transcurridos en Humacao, entre el 28 de mayo y el 8 de octubre de 1976, se resolverá previa vista evidenciaria al efecto, de próximo señalamiento". Caso Núm. RE-89-650, Parte I, Apéndice, *Exhibit* 2, pág. 31. El señalamiento es inmeritorio.

■ En materia de juicios por separado, los tribunales gozan de gran discreción. Véase la Regla 38.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III.([10]) Al avalar la determinación de instancia es innecesario pronunciarnos ahora en torno a la contención de Levy de que el tribunal erró al no determinar que los susodichos ciento treinta y tres (133) días "constituyen un atraso en la terminación del proyecto causado al contratista por causas dentro del control del dueño o por razones imputables a éste". Caso Núm. RE-89-650, Parte I, Solicitud de revisión o *certiorari*, pág. 9. Según indicado, la cuestión será objeto en la vista evidenciaria.

---

([10]) La Regla 38.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone que:

"El tribunal por razón de conveniencia, o para evitar perjuicio, o para evitar gastos innecesarios, o para facilitar la más pronta terminación del litigio, podrá ordenar un juicio por separado de cualquiera demandas, demandas contra coparte, reconvenciones, demandas contra tercero, o de cualquiera cuestiones litigiosas independientes, y podrá dictar sentencia de acuerdo con lo dispuesto en la Regla 43.3." Véase *Vellón v. Squibb Mfg., Inc.*, 117 D.P.R. 838 (1986).

# V

Réstanos examinar los señalamientos de la Autoridad. Impugna: las conclusiones de que las extensiones de tiempo adicional concedidas a Levy le impidieron continuar el desarrollo normal y ordenado de su trabajo según planificado; que Levy tenga "derecho a que el exceso de 103 a 145 días calendario respectivos para un total de 248 días calendarios de prolongación de obra extraordinaria se le compense y reembolsen en cuanto a los gastos fijos e indirectos a los que la sentencia se refiere" (Caso Núm. RE-89-650, Parte I, Apéndice, *Exhibit* 2, pág. 20); que la primera conclusión aplique a ambos proyectos; que el tribunal haya descansado en las conclusiones del Comisionado Especial y haya resuelto que "las órdenes de cambio solicitadas por el dueño de una obra son sinónimas de atrasos compensables, no teniendo obligación alguna el contratista de probar que los atrasos en que él incurrió durante la construcción de la obra se debieron a causas imputables exclusivamente al dueño y no al propio contratista".

Según antes discutidos, los dos (2) primeros señalamientos de error no fueron cometidos. Tampoco incidió el tribunal de instancia al aplicar a ambos proyectos su determinación de que las extensiones concedidas a Levy por órdenes de cambio le impidieron proseguir normalmente sus desarrollos, según se había planificado. Los contratos son prácticamente idénticos en cuanto a Condiciones Generales y Especiales; tratan sobre la construcción de hospitales; son las mismas partes, y fueron firmados con poco tiempo de diferencia.

Aunque el tribunal reconoció que no contaba con suficiente base para establecer "la categoría y certeza de[l] reclamo" sobre el proyecto de Arecibo (Caso Núm. RE-89-650, Parte I, Apéndice, *Exhibit* 2, pág. 21), enfatizó que las obras eran sustancialmente iguales y que "no existe razón para otorgarles parámetros distintos en cuanto a expecta-

tiva contractual de tiempo adicional de obra y contemplación de gastos por equipo de soporte central o en obra por parte del contratista". Íd., pág. 22. *Esa similitud está avalada en nuestro análisis de los hechos del caso y contratos involucrados*. En ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto, merece nuestra deferencia. *Pérez v. Col. Cirujanos Dentistas de P.R.*, 131 D.P.R. 545 (1992); *Ex parte Valencia*, 116 D.P.R. 909 (1986); *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172 (1985); *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721 (1984); *Morán Simó v. Gracia Cristóbal*, 106 D.P.R. 155 (1977).

La Autoridad no nos ha convencido de que las determinaciones de hechos del Comisionado Especial *"sean claramente erróneas"*. Véase la Regla 41.5 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Su informe exhaustivo y minucioso mereció crédito al tribunal de instancia en los aspectos sustanciales.

La Autoridad nos dice que Levy no probó "que realmente se atrasó por causa del evento alegadamente provocado por el dueño, si se pretende reclamar una compensación por ello". Tampoco nos convence. Desde los inicios del pleito, Levy sostuvo que el número excesivo de órdenes de cambio le causó demoras irrazonables. El tribunal de instancia descansó en el principio de la buena fe inmerso en todo contrato y concluyó que los cambios alcanzaron dimensiones de mala fe, pues rebasaron los límites de la extensión temporal que debió ser prevista por Levy. Los casos invocados por la Autoridad —principalmente *Commerce International Co. v. U.S.*, 167 Ct. Cl. 529 (1964), y *Wunderlich Contracting Co. v. United States*, 351 F.2d 956 (C. App. 1965)— son diferentes e inaplicables.[11]

---

[11] En *Commerce International Co. v. U.S.*, 167 Ct. Cl. 529, 338 F.2d 81 (1964), el contratista había recibido advertencias del Gobierno de probables tardanzas en la entrega de piezas y materiales para la reparación de tanques de guerra. Como no había garantía específica de que no habría retrasos, el tribunal concluyó que *Commerce International Co. v. U.S.*, supra, no podía prevalecer probando solamente que

 Reiteramos, Levy probó de forma convincente que la interferencia de la Autoridad en la ejecución del contrato debido al excesivo número de órdenes de cambio demoró irrazonablemente el proyecto. Como señaló el ilustrado juez de instancia, "[e]l obstaculizar directa o indirectamente, la ejecución del contrato por parte del contratista, con demoras extraordinarias sin importar cuán necesari[o]s éstas sean, desorganizando así su trabajo y haciéndolo más difícil, constituyeron incumplimiento de contrato que da derecho a la correspondiente indemnización".

Finalmente, la Autoridad aduce que, "cuando ocurran atrasos imputables al contratista y otros imputables al dueño, no procede compensación monetaria adicional alguna para el contratista, así como tampoco el dueño podrá imponer daños líquidos al contratista por los atrasos imputables a éste". Argumenta que ello se conoce en la industria de la construcción como "atrasos concurrentes". En contra, Levy sostiene que esa tesis es errónea, pues el atraso imputable al contratista puede ser el resultado de eventos que no sean concurrentes "con el atraso por el cual ahora se reclama extensión de tiempo".

Al respecto, los comentaristas nos dicen que "los atrasos concurrentes ocurren cuando existen dos o más atrasos independientes durante el mismo período de tiempo". (Traducción nuestra.) Bramble y Callahan, *op. cit.*, Sec. 1.4, pág. 6. En su recurso la Autoridad se limita a señalar los

---

hubo dilación del tiempo en que debía recibirse lo pactado. Esa mera alegación no configuraría automáticamente un incumplimiento.

En el caso de *Wunderlich Contracting Co. v. United States*, 351 F.2d 956 (C. App. 1965), se le imputó al Gobierno un incumplimiento de contrato por haber entregado planos defectuosos. Como Wunderlich *conocía esos defectos*, estaba consciente de que la obra *no* podría ejecutarse en el tiempo pactado y, rechazó la opción que se daba a los postores de licitar a base de un tiempo de ejecución más extenso, el tribunal concluyó que asumió el riesgo de completar el proyecto dentro del tiempo original. Por esa razón, no hubo incumplimiento. Por otro lado, el Tribunal señaló que el demandante no probó sus daños y que, aún habiéndolos sufrido, fueron el resultado de circunstancias especiales causadas por la Guerra de Corea.

atrasos por parte del contratista,[12] mas no demuestra el elemento esencial de la la concurrencia para activar la doctrina de "atrasos concurrentes".

Concluimos que no es aplicable la doctrina de "atrasos concurrentes". La Autoridad no probó que la demora imputable a Levy concurrió en tiempo, con atrasos. Incluso si lo hubiese probado, ello no validaría automáticamente su contención de que Levy no era acreedor a una compensación monetaria adicional. Bramble y Callahan, *op. cit.*, pág. 7.

La Autoridad descansa en *J.A. Jones Const. Co. v. Greenbriar Shopping Center*, 332 F. Supp. 1336 (D. At. 1971), donde, en el contexto de "atrasos concurrentes" entre contratista y dueño, el tribunal determinó que no procedía la compensación para ninguna de las partes. Otras jurisdicciones, sin embargo, rechazan esa doctrina. J.D. Carter, R.F. Cushman y W. Palmer, *Construction Litigation: Representing the Contractor*, 2da ed., Nueva York, Ed. Wiley Law Pubs., 1992, Sec. 16.21, pág. 460. Nos comentan el caso rector de *United States v. William F. Klingensmith, Inc.*, 670 F.2d 1227 (Cir. D.C. 1982), como representativo de la tendencia doctrinaria moderna en materia de atrasos concurrentes:

> El Tribunal determinó que "cuando cada parte atrasa (*delays*) a la otra, cada uno debe poder recobrar en la medida en que fue lesionado por el atraso de la otra parte. El Tribunal entendió que una regla como esa protege a cada parte de pérdidas causadas por el atraso de la otra parte a través del período de ejecución (*performance*). Ésta (la regla) también induce a cada parte a evitar imponer dichas partidas sobre el otro en cualquier momento durante el período de atraso .... Cuando hay atrasos concurrentes del dueño y del contratista, el último es

---

[12] Los atrasos imputados por el dueño de la obra al contratista son:
"Atraso anticipado y contemplado en el plano de trabajo del contratista de 8-1/2 meses (supra); atraso por hormigones deficientes; atraso por construcción deficiente; atraso en establecer organización adecuada al comienzo del proyecto; patrón errático en presentación de certificaciones para pago; atraso por problemas de coordinación con sus subcontratistas; atraso por huelga de subcontratista de mecánica y plomería."

todavía acreedor de una extensión de tiempo. (Traducción nuestra.) Carter, Cushman y Palmer, *op. cit.*, pág. 460.

Como podemos apreciar, la doctrina de *J.A. Jones Const. Co. v. Greenbriar Shopping Center*, supra, no es la mayoritaria ni debemos aceptarla.

*Se dictará sentencia confirmatoria.*

El Juez Asociado Señor Rebollo López emitió un voto particular de conformidad. El Juez Asociado Señor Hernández Denton emitió un voto particular de conformidad, al cual se unió el Juez Asociado Señor Alonso Alonso.

### — O —

Voto particular de conformidad emitido por el Juez Asociado Señor Rebollo López.

El voto de conformidad que brindamos a la Opinión que el Tribunal emite en el día de hoy en el presente caso está predicado, en primer lugar, en que dicha Opinión *reconoce* que en un contrato de construcción —en el cual hay una cláusula que le permite al dueño de la obra hacer cambios (*change orders*), respecto a las especificaciones de la misma, y en el cual existe una cláusula sobre el término de tiempo que tendrá el contratista para entregar la obra al dueño de la misma— tendrá derecho el contratista a recobrar, del dueño, la diferencia en costo que dichos cambios representen y a que se le extienda, por un período de tiempo razonable, la fecha de entrega de la obra terminada; condiciones que, *de ordinario*, son objeto de estipulación por las partes en los contratos de construcción que se otorgan en nuestro País.

En segundo término, dicho voto de conformidad está basado en el hecho de que dicha Opinión *resuelve* que, en ese tipo de contrato, el dueño de la obra *no* le responde al contratista de la misma por los "gastos generales indirectos"

(*job site overhead* y *home office overhead*) en que éste tenga
que incurrir como consecuencia del retraso de tiempo *razo-
nable* en la entrega de la obra, retraso producto de los cam-
bios (*change orders*) ordenados por el dueño de la obra; la
razonabilidad de cuyo retraso dependerá de que el mismo
fuera previsible, conforme a la naturaleza y complejidad de
la obra y la práctica prevaleciente en la industria de la
construcción en Puerto Rico. Véase *Unisys v. Ramallo Bro-
thers*, 128 D.P.R. 842 (1991).([1])

Dicha determinación es producto —conforme, correcta-
mente, se expresa y se concluye en la Opinión del Tribu-
nal— de la práctica generalizada, y aceptada, en la indus-
tria de la construcción en nuestro País a los efectos de que
el constructor que licita respecto a una obra de construc-
ción toma en consideración, por adelantado, al hacer la li-
citación dichos "gastos generales indirectos" por medio de
un por ciento adicional a esos efectos.([2])

Así entendido lo resuelto por el Tribunal, en la Opinión
que emite en el presente caso, brindamos nuestra confor-
midad a dicha ponencia.

**— O —**

Voto particular de conformidad emitido por el Juez Aso-
ciado Señor Hernández Denton, a la cual se une el Juez
Asociado Señor Alonso Alonso.

Emitimos nuestro voto de conformidad porque entende-
mos la opinión del Tribunal del mismo modo que el Juez
Asociado Señor Rebollo López. Esto es, que en circunstan-
cias como las del caso de autos, el contratista tiene derecho
a recobrar del dueño el costo adicional causado por las ór-
denes de cambio emitidas por éste. Además, se le debe con-

---

([1]) 91 J.T.S. 69.

([2]) La referida conclusión del Tribunal está avalada por la prueba pericial más
persuasiva presentada a nivel de instancia.

ceder una extensión de tiempo razonable para la entrega de la obra. Sin embargo, el dueño de la obra no es responsable de pagar al contratista los gastos generales indirectos causados por el retraso razonable de tiempo causado por las órdenes de cambio. La razonabilidad de este período depende de su previsibilidad, de acuerdo con la práctica prevaleciente en la industria.

Por otro lado, los por cientos de razonabilidad aplicados en este caso responden únicamente a sus hechos particulares. Surgen de la naturaleza de los contratos suscritos por las partes, de la complejidad de las construcciones involucradas y de la experiencia de la industria de la construcción en la situaciones como la presentada ante nos. *Por tal razón, cualquier controversia similar que en el futuro surja sobre los gastos adicionales producidos por las órdenes de cambio, se evaluará a la luz de sus circunstancias particulares, sin que necesariamente apliquen los por cientos específicos aquí utilizados.*

Por último, tomamos conocimiento judicial acerca de los numerosos casos que, en el pasado, se han presentado ante nos planteando situaciones y controversias similares. *Esto indica la necesidad imperiosa de que los contratistas y dueños de obras, entre ellos el Estado Libre Asociado de Puerto Rico, estipulen de antemano el tratamiento que se dará a las órdenes de cambio y los costos generales indirectos adicionales que éstas generan.*

Por todo lo anterior, emitimos nuestro voto de conformidad a la opinión del Tribunal.