Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| CAPCON CORP.<br><br>Peticionaria<br><br>v.<br><br>AUTORIDAD DE LOS PUERTOS DE PUERTO RICO<br><br>Recurrida<br>_____<br><br>CAPCON CORP.<br><br>Recurrida<br><br>v.<br><br>AUTORIDAD DE LOS PUERTOS DE PUERTO RICO<br><br>Peticionaria | TA2025CE00530<br><br>consolidado con<br><br>TA2025CE00537 | *CERTIORARI* procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Civil Núm. SJ2017CV02970<br><br>Sobre:<br>Cobro de Dinero e Incumplimiento de Contrato |

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Rivera Torres y el Juez Marrero Guerrero.

**Hernández Sánchez, Juez Ponente**

### RESOLUCIÓN

En San Juan, Puerto Rico, a 16 de octubre de 2025.

El 30 de septiembre de 2025, Capcon Corp. (Capcon) compareció ante nos mediante *Certiorari Civil* en el caso núm. TA2025CE00530. Por su parte, el 1 de octubre de 2025, la Autoridad de los Puertos de Puerto Rico (la Autoridad) compareció ante nos mediante una *Petición de Certiorari* en el caso núm. TA2025CE00537. En ambos recursos, las partes solicitaron la revisión de una *Resolución* que se dictó y notificó el 20 de septiembre de 2025 por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI). Mediante el aludido dictamen, el TPI declaró No Ha Lugar la *Solicitud de Sentencia Sumaria* que presentó la Autoridad el 15 de agosto de 2022.

A tenor con la Orden Administrativa Núm. DJ 2019-316, según enmendada por la Orden Administrativa Núm. DJ 2019-316A que emitió la Jueza Presidenta del Tribunal Supremo, la Hon. Maite Oronoz Rodríguez, y a tenor con la Orden Administrativa Núm. TA 2021-092 que emitió el Juez Administrador del Tribunal de Apelaciones, Hon. Roberto Sánchez Ramos, ordenamos la consolidación del caso núm. TA2025CE00537, con el de mayor antigüedad, el caso núm. TA2025CE00530.

Por los fundamentos que expondremos a continuación, ***denegamos*** los recursos de epígrafe presentados.

I.

El 8 de enero de 2020, Capcon presentó una *Demanda Enmendada* sobre incumplimiento de contratos, cobro de dinero y daños contra la Autoridad.[1] Alegó que, el 13 de febrero de 2012, la Autoridad publicó la subasta núm. 19-12 para la rehabilitación de la antigua Torre de Control localizada en el aeropuerto Rafael Hernández en Aguadilla, Puerto Rico. Adujo que, posteriormente, el 22 de mayo de 2012, la Autoridad, representada por su entonces director ejecutivo, contrató a Capcon para la ejecución de dicha obra por la suma de $3,500,000.00.

Expresó que el contrato estableció un término de ejecución de 300 días calendario, contados a partir de la orden para proceder, y dispuso una penalidad de $1,000.00 por cada día de retraso atribuible a Capcon, siendo el tiempo de ejecución una condición esencial del contrato. Manifestó que la orden de comienzo fue emitida con efectividad del 9 de julio de 2012, lo que fijaba la fecha de terminación sustancial de la obra para el 5 de mayo de 2013.

Asimismo, expuso que el contrato disponía que Capcon podía someter mensualmente aplicaciones de pago parciales, las cuales

---

[1] *Véase*, Entrada Núm. 52, SUMAC TPI.

debían ser pagadas por la Autoridad dentro de 40 días calendario. Sostuvo que, en caso de incumplimiento, los pagos atrasados devengarían intereses. Sin embargo, indicó que la Autoridad no cumplió con los términos de pago acordados, acumulando intereses por la suma de $48,872.37, los cuales continuaban acumulándose y debían ser compensados.

Por otro lado, alegó que, por razones no atribuibles a su gestión, la obra sufrió múltiples cambios, demoras e interferencias, incluyendo retrasos en la toma de decisiones por parte de la Autoridad, lo que provocó un atraso total de 953 días calendario. Expresó que, en reconocimiento de dicho impacto, la Autoridad otorgó una extensión de 785 días, revisando la fecha de terminación sustancial al 30 de junio de 2015. No obstante, sostuvo que la obra alcanzó su terminación sustancial el 15 de diciembre de 2015. Afirmó que la demora adicional entre el 30 de junio y el 15 de diciembre de 2015 fue causada por la Autoridad, por lo que procedía una extensión de tiempo adicional de 168 días calendario. Adujo que la aceptación final de la obra por parte de la Autoridad ocurrió el 14 de marzo de 2016.

En vista de lo anterior, indicó que reclamó oportunamente a la Autoridad el efecto económico acumulativo de las demoras y disloques sufridos durante la ejecución de la obra. Adujo que dichos reclamos fueron objeto de múltiples reuniones sin que se alcanzara un acuerdo para el pago de los balances adeudados. Sostuvo que en relación con los gastos de operación extendida de la oficina del proyecto ("Project Extended Overhead"), la Autoridad acordó y compensó parcialmente a Capcon por los periodos de demora comprendidos entre mayo de 2013 y el 31 de enero de 2015. No obstante, esbozó que, tras auditar los reclamos pendientes, la Autoridad determinó que aún adeudaba $202,440.24 por concepto de gastos de operación extendida de campo correspondientes al

periodo del 1 de febrero al 30 de junio de 2015, cantidad que no había sido pagada. Sostuvo que el monto compensable por dicho periodo asciende realmente a $357,493.51.

De igual manera, indicó que la Autoridad auditó los reclamos de Capcon por concepto de gastos de operación extendida de oficina central ("Main Office Extended Overhead") y determinó adeudar $472,339.51 por el periodo de 2013 a 2014, sin haber realizado el pago correspondiente. De este modo afirmó que el monto compensable por dicho periodo ascendía a $638,485.34. Adujo que, en cuanto al periodo del 1 de enero al 30 de junio de 2015, la Autoridad determinó adeudar $161,031.90 por el mismo concepto, suma que tampoco había sido pagada. Ante ello, expresó que el monto real a compensar ascendía a $370,579.65.

En adición, manifestó que la Autoridad denegó compensarle por el periodo del 1 de julio al 15 de diciembre de 2015, al rechazar la solicitud de extensión de tiempo antes mencionada. Así pues, aseguró que, conforme a la extensión de 168 días reclamada por demoras atribuibles a la Autoridad, procedía una compensación adicional de $301,591.11.

Por otra parte, indicó que los documentos contractuales no reflejaron la existencia de áreas con alto contenido de plomo, las cuales, conforme a los reglamentos aplicables, debieron ser objeto de mitigación. De este modo, planteó que, dado que el contrato eximía al contratista de responsabilidad por condiciones ambientales no reflejadas en los planos o especificaciones, la Autoridad estaba obligada a compensar dichos trabajos, pero expresó que esta se había negado a hacerlo.

Por los motivos antes expuestos, aseguró que la Autoridad le adeudaba las siguientes sumas vencidas, líquidas y exigibles: $1,688,149.60 por gastos de operación extendida, $48,872.37 por intereses acumulados en certificaciones parciales, y $77,264.00 por

la reclamación relacionada con la mitigación de plomo, para un total de $1,814,285.97.

Finalmente, alegó que el incumplimiento de la Autoridad y su falta de pago le habían ocasionado daños adicionales, incluyendo afectaciones a su flujo de efectivo, gastos de financiamiento en líneas de crédito, pérdida de oportunidad de nuevos trabajos y disminución en su capacidad de fianza, lo que estimaba en una suma no menor de $500,000.00. Por todo lo anterior, reclamó una compensación total ascendente a $2,265,413.60, más intereses, costas y honorarios de abogado.

En respuesta, el 12 de febrero de 2020, la Autoridad presentó su *Contestación a la Demanda Enmendada.*[2] En dicho escrito, la Autoridad esencialmente negó la mayoría de las alegaciones formuladas por Capcon y sostuvo que cumplió en todo momento con las obligaciones asumidas conforme al contrato suscrito entre las partes para la rehabilitación de la antigua Torre de Control del Aeropuerto Rafael Hernández en Aguadilla.

Por otro lado, admitió que concedió una extensión del término de ejecución del proyecto, estableciendo mediante la Orden de Cambio Núm. 5 la fecha revisada de terminación para el 30 de junio de 2015. No obstante, negó que la demora adicional experimentada desde esa fecha hasta el 15 de diciembre de 2015 fuera atribuible a su gestión o a actos u omisiones de su parte.

En cuanto a las reclamaciones presentadas por Capcon relacionadas con los conceptos de "Project Extended Overhead" y "Main Office Extended Overhead", negó adeudar las cuantías reclamadas. Además, alegó que corresponderá a Capcon asumir el peso de la prueba y demostrar la veracidad y corrección de las alegaciones contenidas en su *Demanda Enmendada.*

---

[2] *Véase*, Entrada Núm. 56, SUMAC TPI.

Tras varios trámites procesales que no son necesarios detallar, el 15 de agosto de 2022, la Autoridad presentó una *Solicitud de Sentencia Sumaria* en la que solicitó la desestimación total de la *Demanda Enmendada* radicada por Capcon.[3] En primer lugar, argumentó que las reclamaciones de Capcon por concepto de gastos extendidos carecían de mérito, toda vez que el contrato suscrito entre las partes establecía un precio global por la totalidad de la obra, el cual fue aceptado expresamente por ambas partes. Sostuvo que, cualquier modificación al precio o costo del proyecto debía constar por escrito y formalizarse mediante una orden de cambio o acuerdo suplementario, conforme a las normas aplicables a la contratación gubernamental.

Destacó que se suscribieron tres (3) acuerdos suplementarios y cinco (5) órdenes de cambio, para un total de ocho (8) enmiendas al contrato, cuyo contenido demostraba que no se pactaron pagos adicionales por gastos extendidos. Indicó que, por el contrario, las enmiendas expresamente dispusieron que no se realizarían pagos adicionales por ese concepto. A tales efectos, sostuvo que Capcon no podía reclamar compensación por gastos extendidos no incluidos en las órdenes de cambio, por no haberse negociado ni formalizado por escrito, como exigía el ordenamiento jurídico.

En apoyo a su posición, invocó la doctrina reiterada del Tribunal Supremo de Puerto Rico en materia de contratación gubernamental, la cual disponía que los contratos con el Estado solo tenían efecto vinculante si constaban por escrito, y que no era aplicable la figura de la tácita reconducción ni la contratación retroactiva en esos casos. Señaló que permitir lo contrario implicaría avalar pagos sin respaldo contractual y contrarios a los principios

---

[3] *Véase*, Entrada Núm. 93, SUMAC TPI.

de sana administración pública y de disposición responsable de fondos públicos.

De igual forma, enfatizó que las enmiendas suscritas incluyeron cláusulas expresas de renuncia por parte de Capcon a reclamar compensaciones adicionales, incluyendo gastos extendidos, daños, demoras o ajustes de cualquier tipo. A tales efectos, citó el lenguaje utilizado en las órdenes de cambio, en el cual Capcon reconoció que los precios negociados incluían gastos de oficina central y de campo, utilidades, seguros, fianzas, arbitrios y cualquier otro costo incidental necesario para la ejecución de los trabajos. Asimismo, expresó que las órdenes de cambio 4 y 5 solo excluían parcialmente el "main office overhead", pero mantuvieron la renuncia expresa a reclamar otros gastos extendidos.

Aseguró que nunca se materializó un acuerdo escrito que reconociera obligación alguna de pagar los gastos extendidos reclamados por Capcon. Además, recalcó que cualquier comunicación o entendimiento informal no tenía fuerza jurídica, ya que en las relaciones contractuales con el Estado no aplicaba la doctrina de los actos propios ni podía alegarse expectativa de pago sin un contrato escrito, vigente y registrado ante la Oficina del Contralor. Por tanto, argumentó que la reclamación de Capcon por gastos extendidos resultaba improcedente como cuestión de derecho.

En cuanto a la reclamación de Capcon por los trabajos de mitigación de plomo, sostuvo que estos estaban comprendidos dentro del ámbito del contrato. Alegó que las especificaciones técnicas, incorporadas como parte integral del contrato, incluían los requisitos para la mitigación del plomo identificado en el proyecto, y que Capcon tenía la obligación de realizar sus propias pruebas para detectar la presencia de dicho material. Por tanto, indicó que los costos asociados a esas labores debieron estar incluidos en la

cotización original presentada por Capcon al momento de la subasta.

Afirmó que Capcon conocía desde el inicio que se trataba de una estructura antigua y que la presencia de pintura con plomo era una condición previsible. Además, sostuvo que Capcon tuvo acceso a los informes de inspección antes de la adjudicación y no planteó objeción alguna sobre la extensión de los trabajos de mitigación. Indicó también que el itinerario base sometido por Capcon incluía expresamente actividades relacionadas con la detección y limpieza de plomo.

Explicó que, en aquellos casos en que se identificaron áreas con contaminación de plomo no contempladas originalmente, dichas labores adicionales se reconocieron y compensaron mediante órdenes de cambio debidamente suscritas, específicamente la Orden de Cambio Núm. 2, que incluyó partidas adicionales por trabajos de descontaminación en el equipo de comunicación histórico y en los cuartos del generador y eléctricos. Sin embargo, sostuvo que cualquier otro trabajo de mitigación alegado por Capcon formaba parte del alcance contractual original y, por ende, no procedía compensación adicional.

Por último, argumentó que la reclamación de Capcon para el pago de trabajos de mitigación de plomo constituía, en esencia, un intento de obtener una doble compensación por labores que ya estaban incluidas en su oferta y en el contrato adjudicado. A su entender, la ausencia de un acuerdo escrito que reconociera una nueva obligación de pago hacía que dicha reclamación fuese improcedente.

En conclusión, alegó que en las enmiendas y acuerdos firmados por las partes no se pactó el pago de gastos extendidos ni de trabajos adicionales de mitigación de plomo. Además, sostuvo que Capcon renunció expresamente a cualquier reclamación de

compensación adicional y que, conforme a la normativa de contratación gubernamental, ninguna obligación de pago podía surgir sin constar por escrito. En virtud de ello, solicitó al Tribunal que declarara con lugar la Sentencia Sumaria y desestimara con perjuicio todas las reclamaciones instadas por Capcon, incluyendo las de gastos extendidos, intereses y mitigación de plomo.

Así las cosas, el 3 de octubre de 2022, Capcon presentó su *Oposición a Moción Solicitando Sentencia Sumaria presentada por la Demandada.*[4] En esta, sostuvo que el contrato suscrito con la Autoridad fue producto de una subasta pública, debidamente formalizado por escrito y registrado en la Oficina del Contralor, en cumplimiento con todas las disposiciones legales y reglamentarias aplicables a la contratación gubernamental. Afirmó que las órdenes de cambio y enmiendas al contrato también fueron reducidas a escrito, firmadas por ambas partes y registradas, por lo que constituían instrumentos válidos y exigibles.

Expresó que la Autoridad incurrió en error al afirmar que no existía disposición contractual que respaldara la compensación reclamada. Aseguró que el propio contrato contemplaba mecanismos para compensar atrasos o costos adicionales no imputables al contratista. Sin embargo, indicó que aun si no existiese tal previsión, la normativa aplicable y la jurisprudencia reconocían la procedencia de tales reclamaciones cuando los atrasos fuesen atribuibles al dueño de la obra.

Además, argumentó que, una vez el Estado celebraba un contrato válido, quedaba sujeto a las mismas obligaciones que una parte privada, y estaba obligado a cumplir fielmente con lo pactado bajo el principio de buena fe contractual. Por lo tanto, planteó que la Autoridad no podía invocar el carácter público de los fondos para

---

[4] *Véase*, Entrada Núm. 99, SUMAC TPI.

evitar el cumplimiento de sus obligaciones contractuales, especialmente cuando no se había alegado ni demostrado ilegalidad o corrupción alguna.

Por otro lado, explicó que los gastos extendidos reclamados consistían en los costos adicionales en que incurrió debido a la prolongación del tiempo de ejecución del proyecto, tanto a nivel de campo (project extended overhead) como en la oficina central (main office extended overhead). Alegó que estos gastos eran consecuencia directa de los atrasos imputables a la Autoridad, por lo que ésta debía responder por ellos.

En apoyo a su posición, citó el precedente de *Francisco Levy v. Autoridad de Edificios Públicos*, 135 DPR 382 (1994), donde el Tribunal Supremo reconoció el derecho de un contratista a reclamar gastos extendidos aun cuando el contrato no los contemplara expresamente. De igual modo, indicó que conforme al contrato y a las condiciones generales aplicables, la Autoridad se obligó a compensar dichos gastos cuando los atrasos fueran causados por el dueño. Asimismo, afirmó que, la Autoridad reconoció parcialmente su obligación al emitir pagos y realizar auditorías en las que se determinaron sumas a favor de Capcon. Así pues, expresó que la posición actual de la Autoridad contradecía los propios acuerdos escritos, las auditorías oficiales y el principio de buena fe contractual.

Por otra parte, rechazó categóricamente el argumento de la Autoridad de que renunció a sus reclamaciones de gastos extendidos en las órdenes de cambio. Sostuvo que la alegada renuncia se basaba en un lenguaje genérico incluido en formularios preimpresos utilizados por la Autoridad, que no formaban parte integral de los documentos contractuales originales ni reflejaban la verdadera intención de las partes.

Señaló que desde la primera orden de cambio las partes acordaron expresamente que los asuntos relacionados con gastos extendidos serían atendidos en órdenes posteriores. Manifestó que en las órdenes de cambio subsiguientes —particularmente la tercera, cuarta y quinta— se reconocieron extensiones de tiempo y se consignaron partidas específicas por concepto de *project extended overhead*, dejando constancia de que permanecían pendientes días y gastos adicionales por compensar, tanto del proyecto como de la oficina principal. Asimismo, resaltó que realizó reservas expresas en comunicaciones incorporadas a las órdenes de cambio, las cuales fueron aceptadas por la Autoridad sin objeción. Indicó que, a su vez, las auditorías realizadas por la propia Autoridad reconocían la existencia de los gastos reclamados y su obligación de pago.

En cuanto al aspecto jurídico, invocó el Art. 1234 del Código Civil de 1930, 31 LPRA sec. 3472, que disponía que para interpretar los contratos debe atenderse a los actos coetáneos y posteriores de las partes, con el fin de determinar su verdadera intención. Argumentó que la interpretación de la Autoridad, basada únicamente en el texto literal de una cláusula genérica, era contraria a los principios de hermenéutica contractual y de buena fe.

De igual forma, expresó que la renuncia de derechos bajo el Art. 4 del Código Civil de 1930, 31 LPRA sec. 4 no se presumía y debía ser clara, expresa y específica, lo cual no ocurría en este caso. Por tanto, la supuesta renuncia alegada por la Autoridad carecía de validez jurídica y no podía tener el efecto de privar a Capcon de su derecho a reclamar los gastos extendidos que legítimamente le correspondían.

Concluyó que tanto la conducta de las partes como los documentos contractuales y las auditorías demostraban que la Autoridad reconoció la procedencia de las reclamaciones y su obligación de pago. En consecuencia, indicó que la posición

contraria asumida ahora por la Autoridad constituía una violación a los principios de obligatoriedad contractual y buena fe.

En relación con la reclamación de compensación por trabajos de mitigación de plomo, argumentó que la Autoridad interpretó erróneamente el contrato. Alegó que las labores de mitigación originalmente previstas y subastadas se limitaron a las áreas descritas en los documentos técnicos y en los informes de inspección entregados por la Autoridad antes del inicio de la obra. Sin embargo, señaló que durante la ejecución del proyecto se descubrieron nuevas áreas contaminadas con plomo que no estaban contempladas en los documentos contractuales originales, lo que generó trabajos adicionales no previstos en la cotización inicial.

Aseguró que la Autoridad reconoció la existencia de esas áreas adicionales y aprobó pagos por trabajos de descontaminación específicos mediante la Orden de Cambio Núm. 2, donde se identificaron las labores y se consignaron las cantidades correspondientes. No obstante, expresó que las nuevas condiciones que surgieron posteriormente provocaron costos adicionales que la Autoridad no había reconocido ni compensado.

Planteó que no podía pretenderse que Capcon absorbiera el costo de trabajos extraordinarios no previstos originalmente, pues el contrato establecía que los precios eran fijos únicamente respecto a las condiciones existentes al momento de la subasta. Indicó que cualquier cambio en el alcance o naturaleza de las labores requeridas debía reflejarse en una orden de cambio adicional.

Asimismo, enfatizó que cumplió cabalmente con sus obligaciones contractuales y realizó los trabajos necesarios para garantizar la seguridad del proyecto y el cumplimiento con las normas ambientales. Argumentó que, por ello, la Autoridad no podía invocar que las labores formaban parte del contrato para eludir su obligación de pagar los trabajos adicionales que ella misma requirió.

Finalmente, expresó que las controversias planteadas por la Autoridad no eran susceptibles de resolución mediante sentencia sumaria, ya que existían controversias genuinas sobre hechos materiales esenciales, incluyendo la interpretación de las cláusulas contractuales, la intención de las partes y la procedencia de los gastos reclamados.

Adujo que el contrato fue válidamente otorgado, registrado y ejecutado; que la Autoridad incurrió en atrasos imputables que generaron costos adicionales; que se realizaron trabajos fuera del alcance original; y que la propia Autoridad reconoció parcialmente dichas obligaciones mediante auditorías y órdenes de cambio. Por estos motivos, solicitó que se denegara la moción de sentencia sumaria presentada por la Autoridad y dispusiera la continuación de los procedimientos, a fin de dilucidar en su fondo las reclamaciones planteadas.

Posteriormente, el 12 de noviembre de 2022, la Autoridad presentó una *Réplica a "Oposición a Solicitud de Sentencia Sumaria".*[5] Por su parte, el 2 de diciembre de 2022, Capcon presentó una *Dúplica a Réplica Sobre Oposición a Mocion Solicitando Sentencia Sumaria.*[6] Evaluados los escritos antes expuestos, el 20 de septiembre de 2024, el TPI dictó una *Resolución.*[7] En primer lugar, expuso once (11) hechos incontrovertidos. Luego, sostuvo que los siguientes hechos estaban en controversia: (1) si Capcon renunció, o no, a reclamar gastos por *field and main office extended overhead*; (2) de contestarse en la afirmativa, la cuantía de dichos pagos; (3) si Capcon tenía una obligación de mitigar los daños o el contenido del plomo, o si le correspondía a la Autoridad atenderlo; (4) si las demoras alegadas le ocasionaron daños y/o pérdidas monetarias a

---

[5] *Véase*, Entrada Núm. 113, SUMAC TPI.
[6] *Véase*, Entrada Núm. 118, SUMAC TPI.
[7] *Véase*, Entrada Núm. 126, SUMAC TPI.

Capcon; y, por último (5) de contestarse en la afirmativa, la porción y/o valorización de dichos daños y/o pérdidas monetarias reclamadas.

En atención a lo antes expuesto, resolvió que no procedía dictar sentencia sumaria en esta etapa del caso, ya que existían controversias de hecho esenciales sobre la procedencia de los gastos extendidos reclamados por Capcon. Señaló que no estaba claro si Capcon renunció realmente a esas partidas ni si las mismas quedaron cubiertas en las órdenes de cambio. Además, expresó que Capcon había alegado que la Autoridad reconoció parcialmente dichos gastos, y que en las órdenes de cambio se dejó constancia de que quedaban asuntos pendientes por atender durante el curso de la obra.

Por ello, determinó que era necesario permitir la presentación de más prueba para esclarecer esas controversias y adjudicar el remedio correspondiente. Concluyó que el mecanismo de sentencia sumaria no era apropiado en este caso, especialmente porque había elementos de credibilidad e interpretación contractual que debían evaluarse en un proceso plenario. En consecuencia, denegó la solicitud de sentencia sumaria presentada por la Autoridad.

Ambas partes presentaron sus respectivas solicitudes de reconsideración.[8] Atendidas las solicitudes, el 2 de septiembre de 2025, el TPI emitió y notificó una *Resolución* denegando ambas solicitudes de reconsideración.[9] En consecuencia, ordenó la continuación de los procedimientos.

Aún en desacuerdo, el 30 de septiembre de 2025, Capcon presentó un *Certiorari Civil* en el caso núm. TA2025CE00530 y formuló el siguiente señalamiento de error:

---

[8] *Véase*, Entradas Núms. 129 y 131, SUMAC TPI.
[9] *Véase*, Entrada Núm. 153, SUMAC TPI.

**Erró el Honorable TPI negarse a revisar las determinaciones de hechos 4, 5, 6, 7, y 9 de la Resolución dictada el 20 de septiembre de 2024.**

Por su parte, el 1 de octubre de 2025, la Autoridad presentó una *Petición de Certiorari* en el caso núm. TA2025CE00537 y formuló los siguientes señalamientos de error:

**Erró el TPI al no disponer sumariamente de la controversia tras aceptar una serie de hechos incontrovertidos que demuestran que los gastos extendidos reclamados por Capcon resultan improcedentes, pues no figuraba un acuerdo vinculante que cumpliera con los requisitos legales y jurisprudenciales aplicables a la contratación gubernamental.**

**Erró el TPI al denegar la solicitud de sentencia sumaria de la APPR, ante el hecho de que todas las enmiendas y órdenes de cambio no solo contemplaron los costos que supondría la extensión de tiempo acordada, sino que Capcon acordó una renuncia expresa y por escrito a los gastos extendidos que las extensiones de tiempo pudieran generar.**

**Erró el TPI al no desestimar la causa referente a la obligación de mitigación de plomo, a pesar de que incluyó en la resolución recurrida una serie de hechos que estimó como incontrovertidos que demostraban que dicha obligación estaba contemplada como parte del ámbito de trabajo subastado y a tenor con las disposiciones contractuales.**

Atendidos los recursos de epígrafe, el 1 de octubre de 2025, emitimos una *Resolución* concediéndole a las partes hasta el 10 de octubre de 2025 para presentar su posición en cuanto a los recursos presentados. Oportunamente, las partes presentaron sus respectivas oposiciones. Con el beneficio de la comparecencia de ambas partes, procedemos a atender el asunto ante nos. *Veamos.*

II.

El *certiorari* es el vehículo procesal extraordinario utilizado para que un tribunal de mayor jerarquía pueda corregir un error de derecho cometido por un tribunal inferior. *Torres González v. Zaragoza Meléndez,* 211 DPR 821, 846-847 (2023). Los tribunales apelativos tenemos la facultad para expedir un *certiorari* de manera

discrecional. Íd., pág. 847. Esta discreción se define como "el poder para decidir en una u otra forma, esto es, para escoger entre uno o varios cursos de acción". *García v. Padró*, 165 DPR 324, 334 (2005). Asimismo, discreción es una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justa. Íd., pág. 335. Ahora bien, la aludida discreción que tiene este foro apelativo para atender un *certiorari* no es absoluta. Íd. Esto ya que no tenemos autoridad para actuar de una forma u otra, con abstracción total al resto del derecho, pues ello constituiría abuso de discreción. Íd. Así, "el adecuado ejercicio de la discreción judicial esta inexorable e indefectiblemente atado al concepto de la razonabilidad". Íd.

La Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1, establece que el recurso de *certiorari* para resolver resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, será expedido por el Tribunal de Apelaciones cuando se recurre de: (1) una resolución u orden bajo la Regla 56 (Remedios Provisionales) y la Regla 57 (*Injunction*) de las Reglas de Procedimiento Civil; (2) la denegatoria de una moción de carácter dispositivo y; (3) por excepción de: (a) decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales; (b) asuntos relativos a privilegios probatorios; (c) anotaciones de rebeldía; (d) casos de relaciones de familia; (e) casos que revistan interés público; y (f) cualquier otra situación en la que esperar a la apelación constituiría un fracaso irremediable de la justicia.

Por su parte, la Regla 40 del Tribunal de Apelaciones, *In re Aprob. Enmdas. Reglamento TA,* 2025 TSPR 42, págs. 59-60, 215 DPR ____ (2025), enmarca los criterios que debe evaluar este tribunal al expedir un auto de *certiorari.* La aludida regla establece lo siguiente:

> El tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de certiorari o de una orden de mostrar causa:

(A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.

(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

Ninguno de los criterios de la Regla 40 del Reglamento del Tribunal de Apelaciones, s*upra*, es determinante por sí solo para el ejercicio de jurisdicción, y tampoco constituyen una lista exhaustiva. *García v. Padró*, supra. La norma vigente es que un tribunal apelativo solo intervendrá con las determinaciones discrecionales del Tribunal de Primera Instancia, cuando este haya incurrido en arbitrariedad, craso abuso de discreción o en un error en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo. *Pueblo v. Rivera Santiago*, 176 DPR 559, 581 (2009).

### III.

Nos corresponde justipreciar si debemos ejercer nuestra facultad discrecional al amparo de los criterios enmarcados en la Regla 40 del Tribunal de Apelaciones, *supra.* Luego de examinar los argumentos de ambas partes la luz de los criterios de la Regla 40 del Tribunal de Apelaciones, *supra,* no identificamos razón por la cual este Foro deba intervenir en el dictamen recurrido. Ello, ya que no se presentan ninguna de las situaciones que allí se contemplan.

Recordemos que nuestro ordenamiento jurídico nos brinda la discreción de intervenir en aquellos dictámenes interlocutorios o postsentencia en los que el TPI haya sido arbitrario, cometido un craso abuso de discreción o cuando, de la actuación del foro, surja un error en la interpretación o la aplicación de cualquier norma procesal o de derecho sustantivo. Reiteramos que en los recursos que aquí atendemos no se nos ha demostrado que haya alguno de estos escenarios.

IV.

Por los fundamentos antes expuestos, ***denegamos*** los recursos de epígrafe presentados.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones