ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL X

| MR. MÉNDEZ CONSTRUCTION, CORP. APELADO | | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Arecibo |
|---|---|---|
| v. | TA2025AP00679 | Caso Núm. AR2023CV01030 |
| MUNICIPIO AUTÓNOMO DE MANATÍ APELANTE | | Sobre: Incumplimiento Contractual; Enriquecimiento Injusto; Cobro de Dinero |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Ronda Del Toro y la Juez Lotti Rodríguez.

Lotti Rodríguez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de enero de 2026.

Comparece el Municipio Autónomo de Manatí (en adelante, Municipio o apelante) mediante un recurso de *Apelación* y nos solicita que revisemos una *Sentencia Parcial* emitida por el Tribunal de Primera Instancia, Sala Superior de Arecibo (en adelante, TPI o foro primario) mediante la cual se denegó una solicitud de sentencia sumaria presentada por el Municipio y se determinó que existía una relación contractual fundamentada en unas Órdenes de Cambio firmadas por las partes y se ordenó a la parte apelante proceder con la presentación y el registro de dichas "enmiendas" en el Registro de Contratos de la Oficina del Contralor de Puerto Rico.

Por los fundamentos que exponemos a continuación, *confirmamos* la *Sentencia Parcial* apelada.

**I.**

El 5 de junio de 2023, Mr. Méndez Construction, Corp. (en adelante, Mr. Méndez o apelado) presentó una *Demanda*[1] en contra del Municipio por

---

[1] Entrada Núm. 1 del Sistema Unificado de Manejo y Administración de Casos (SUMAC) del TPI.

incumplimiento contractual, enriquecimiento injusto y cobro de dinero, en la que reclamó el pago de trabajos realizados bajo un contrato de construcción suscrito entre las partes, adjudicado mediante subasta pública, para la construcción del Centro de Convenciones del Municipio. En su Demanda, la parte apelada alegó que, el 28 de mayo de 2015, la Junta de Subastas del Municipio le adjudicó la construcción del Centro de Convenciones de dicho municipio y que el 5 de octubre de 2015 las partes suscribieron un *Contrato de* [sic] *para la Construcción del Centro de Convenciones del Municipio Autónomo de Manatí*, registrado bajo el núm. 2016-000100.

Mr. Méndez señaló que, aunque el contrato tenía una vigencia inicial hasta el 13 de octubre de 2016, dicho término fue extendido mediante varias órdenes de cambio emitidas durante la ejecución del proyecto, incluidas las Órdenes de Cambio Núm. 5, 6 y 7. La parte apelada indicó que, para el 16 de diciembre de 2016, se paralizó la construcción, esto debido a que el Municipio no aprobó las órdenes de cambio que correspondían a la extensión del contrato. Por lo anterior, solicitó al tribunal que ordenara a la parte apelante el pago de la suma de $429,496.48 correspondiente a las obras realizadas y no pagadas, y solicitó, además, una suma por concepto de honorarios de abogados.

Ante señalamientos del Municipio sobre la vaguedad de las alegaciones relativas a la vigencia del contrato y a la fecha en que fueron realizados los trabajos, el foro primario ordenó a la parte apelada una exposición más definida de sus alegaciones.[2] En cumplimiento, el 6 de noviembre de 2023, Mr. Méndez presentó una *Demanda Enmendada*[3], en la que, entre otras cosas, detalló el proceso que se había llevado a cabo para extender la vigencia del contrato a través de las distintas órdenes de cambio.

---

[2] Véanse Entradas Núm. 15 y 16 del SUMAC del TPI.
[3] Entrada Núm. 18 del SUMAC del TPI.

Tras varias mociones dispositivas presentadas por el Municipio, las cuales fueron declaradas No Ha Lugar por el foro primario, el 27 de marzo de 2024, la parte apelante presentó su *Contestación a Demanda Enmendada*[4], negando la existencia de un contrato vigente al momento de los trabajos reclamados. Asimismo, señaló que el Municipio había pagado todo aquello que era exigible bajo el contrato en disputa.

Luego de culminado el descubrimiento de prueba, el 24 de enero de 2025, la parte apelante presentó una *Moción de Sentencia Sumaria*[5] en la que manifestó que las Órdenes de Cambios no extendían la vigencia del contrato hasta tanto fueran firmadas por ambas partes y estuvieran registradas en la Oficina del Contralor de Puerto Rico. Arguyó que el 26 de noviembre de 2016, luego de la aprobación de cuatro (4) órdenes de cambio, el contrato venció sin enmienda posterior. Añadió que, luego de vencido el contrato, recibió las órdenes 5, 6 y 7 firmadas por todas las partes. No obstante, mencionó que estas no cobraron vigencia, toda vez que no fueron registradas en la Oficina del Contralor de Puerto Rico. La parte apelante anejó a su solicitud las Órdenes de Cambio.

En respuesta, el 21 de febrero de 2025, Mr. Méndez presentó una *Moción en Oposición a la Sentencia Sumaria.*[6] En su oposición, la parte apelada sostuvo que las Órdenes de Cambio Núm. 5, 6 y 7 constituyeron enmiendas contractuales válidas y vinculantes. Expresó que la prueba documental demostraba la extensión del contrato, toda vez que las Órdenes de Cambio fueron firmadas por todas las partes y el Municipio omitió notificarlas a la Oficina del Contralor de Puerto Rico.

Pendiente de que el tribunal adjudicara la solicitud de sentencia sumaria, el 10 de marzo de 2025, la parte apelada presentó una *Moción*

---

[4] Entrada Núm. 31 del SUMAC del TPI.
[5] Entrada Núm. 59 del SUMAC del TPI.
[6] Entrada Núm. 62 del SUMAC del TPI.

*Informativa Sometiendo Demanda Enmendada*[7] mediante la cual pretendió enmendar las alegaciones de la demanda, a los efectos de exponer que las Órdenes de Cambio 5, 6 y 7 fueron firmadas por las partes y, en su consecuencia, el contrato fue extendido.

El 19 de marzo de 2025 el Municipio, mediante *Moción en Oposición a Moción Informativa Sometiendo Demanda Enmendada y en Oposición a Demanda*[8], expresó que el descubrimiento de prueba había culminado y que la enmienda solicitada por Mr. Méndez causaría un perjuicio indebido, toda vez que complicaría los procedimientos con planteamientos carentes de justificación legal. Además, señaló que la parte apelada omitió justificar la demora en la solicitud de enmienda.

El 1 de abril de 2025 el TPI denegó la solicitud de enmienda a la demanda presentada por Mr. Méndez y, posteriormente, el 30 de abril de 2025 reiteró su determinación declarando No Ha Lugar la reconsideración presentada por la parte apelada el 15 de abril de 2025.[9]

Luego de varios trámites procesales, el 22 de octubre de 2025 el TPI emitió una *Sentencia Parcial*[10] en la que determinó que la parte apelada incumplió con los requisitos de la Regla 36 de Procedimiento Civil y tuvo por admitidos los hechos propuestos por el Municipio en la *Moción de Sentencia Sumaria*, los cuales se relacionan a continuación:

1. El 5 de octubre de 2015, el Municipio y la parte demandante otorgaron un contrato para la construcción del Centro de Convenciones del Municipio Autónomo de Manatí. Al contrato se le asignó el número 2016-000100. Véase Anejo 1, copia fiel y exacta del contrato; y Anejo 19-a, declaración jurada de la secretaria municipal, párr. 5.

2. El contrato establecía como cuantía máxima a pagar, la suma total de $2,276,000.00. Anejo 1, antes, Cláusula 3, pág. 3.

3. La vigencia del contrato fue del 15 de octubre de 2015 hasta el 13 de octubre de 2016. *Id.*, Cláusula (sic) Décima Primera, pág. 4.

---

[7] Entradas Núm. 65 y 66 del SUMAC del TPI.
[8] Entrada Núm. 68 del SUMAC del TPI.
[9] Véanse Entradas Núm. 69, 70, 71 y 72 del SUMAC del TPI.
[10] Entrada Núm. 82 del SUMAC del TPI.

4. El contrato define el término de culminar sustancial cuando la obra esté terminada y aceptada en un 95% y que solo queden por corregir deficiencias menores como reparaciones de puertas, etc. *Id.,* Cláusula 13, pág. 4.

5. El contrato advirtió de la necesidad de registrar y enviar a la OCPR dentro de los términos de tiempo establecidos por Ley, toda solicitud de extensión de tiempo y/o cambio en los trabajos, en cumplimiento y conforme la Carta Circular OC-1 0-07 emitida por el Contralor de Puerto Rico, sobre proyectos u obras de construcción. *Id.,* Cláusula (sic) Undécima, pág. 3.

6. El contrato advirtió que "cualquier tiempo o trabajo adicional que [la parte demandante] dedique en exceso de lo pactado, no podr[ían] ser facturado en la factura correspondiente" y que "dichos servicios se considerar[ían] ofrecidos "ad honorem", salvo que mediare el correspondiente documento de enmienda debidamente suscrito por las partes." *Id.,* Cláusula (sic) Décimo Segunda, pág. 3.

7. El contrato reiteró, que, "ninguna prestación o contraprestación objeto de este contrato podr[ía] exigirse hasta tanto el mismo se haya presentado para registro en la Oficina del Contralor a tenor con lo antes dispuesto en la Ley Núm. 18 del 30 de octubre de 1975, según enmendada." *Id.,* Cláusula 26, pág. 5.

8. A la par con lo anterior, el contrato estableció que, "conforme a los derechos y normas que rigen la contratación de servicios, [la parte demandante] toma conocimiento de que no podrá prestar servicio alguno bajo el contrato, hasta tanto sea firmado por ambas partes y sea registrado." *Id.,* Cláusula 28, primera frase, pág. 6.

9. El contrato también advirtió que, "no se podrá prestar servicios bajo este contrato a partir de la fecha de su expiración, excepto que a la fecha de expiración exista una enmienda extendiendo su vigencia, **firmada por ambas partes, debidamente registrada**." (énfasis en el original) *Id.,* Cláusula 28, segunda frase, pág. 6.

10. El contrato, además, dispuso que "**no se pagarán servicios prestados en la violación de esta cláusula y cualquier funcionario de EL MUNICIPIO que solicite y acepte servicios de [la parte demandante] en violación a esta disposición lo estará haciendo sin autoridad legal alguna, constituyendo su actuación una ultra vires, que no vincula a EL MUNICIPIO.**" (énfasis en el original) *Id.,* Cláusula 28, tercera frase, pág. 6.

11. Las partes contratantes pactaron que la parte demandante "una vez terminada la obra deberá ofrecer evidencia y declaraciones juradas del cumplimiento de todas sus obligaciones contractuales y fiscales, municipales, estatales y federales, relacionadas con el proyecto antes de recibir el pago del 10% retenido total" y que "de no dar cumplimiento al ofrecimiento de la evidencia requerida, EL MUNICIPIO retendrá el 10% hasta tanto se dé cumplimiento a lo antes establecido." *Id.,* Cláusula 69, pág. 10.

12.    Cualquier problema que pudiese crear un impase durante la construcción se sometería a arbitraje bajo la Ley de Puerto Rico y el costo de los honorarios del árbitro sería satisfechos en partes iguales. *Id.*, Cláusula 73, pág. 10.

13.    El contrato 2016-000100 se registró el 8 de octubre de 2015 en la OCPR. Véase Anejo 2, hoja de registro; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 6.

14.    El 10 de junio de 2016, la parte demandante solicitó orden de cambio 1 solicitando, en lo pertinente a la controversia, 35 días de extensión de contrato, 5 por lluvia y 30 por permiso de construcción de AEE. Véase Anejo 3, orden de cambio No. 1; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 7.

15.    El 28 de julio de 2016, la Junta de Subastas del Municipio autorizó los 35 días de extensión de contrato, llevando el contrato a una nueva fecha de vigencia al 17 de noviembre de 2016. Véase Anejo 4, Acta Núm. 7; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 8.

16.    El 4 de agosto de 2016, las partes otorgaron la primera enmienda al contrato 2016-000100 extendiendo la fecha de vigencia al 17 de noviembre de 2016. Véase Anejo 5, Contrato 2016-000100-A; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 9.

17.    La primera enmienda del contrato se registró el 5 de agosto de 2016 en la OCPR. Véase Anejo 6, hoja de registro; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 10.

18.    El 7 de septiembre de 2016, la parte demandante solicitó orden de cambio 2 solicitando, en lo pertinente a la controversia, cero (0) días de extensión de contrato. Véase Anejo 7, orden de cambio No. 2; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 11.

19.    El 29 de septiembre de 2016, la Junta de Subastas del Municipio autorizó los 0 días de extensión de contrato, manteniendo la fecha de vigencia al 17 de noviembre de 2016. Véase Anejo 8, Acta Núm. 18; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 12.

20.    El 13 de octubre de 2016, las partes otorgaron la segunda enmienda al contrato 2016-000100 variando la cuantía del contrato sin variar o alterar la vigencia del contrato al 17 de noviembre de 2016. Véase Anejo 9, Contrato 2016-000100-B; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 13.

21.    La segunda enmienda del contrato se registró el 12 de octubre de 2016 en la OCPR. Véase Anejo 10, hoja de registro.

22.    El 19 de octubre de 2016, la parte demandante solicitó orden de cambio 3 solicitando, en lo pertinente a la controversia, un (1) día de extensión de contrato. Véase Anejo 11, orden de cambio No. 3; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 14.

23.    El 20 de octubre de 2016, la Junta de Subastas del Municipio autorizó 1 día de extensión de contrato, moviendo la fecha de vigencia al 18 de noviembre de 2016. Véase Anejo 12, Acta 23; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 15.

24. El 2 de noviembre de 2016, las partes otorgaron la tercera enmienda al contrato 2016-000100 otorgando 1 día de extensión de vigencia, llevando el contrato a la nueva fecha de vigencia del 18 de noviembre de 2016. Véase Anejo 13, Contrato 2016-000100-C; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 16.

25. La tercera enmienda del contrato se registró el 7 de noviembre de 2016 en la OCPR. Véase Anejo 14, hoja de registro; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 17.

26. El 2 de noviembre de 2016, la parte demandante solicitó orden de cambio 4 solicitando, en lo pertinente a la controversia, 8 día de extensión de contrato, para una vigencia hasta el 26 de noviembre de 2016. Véase Anejo 15, orden de cambio No. 4; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 18.

27. El 10 de noviembre de 2016, la Junta de Subastas del Municipio autorizó 8 días de extensión de contrato, moviendo la fecha de vigencia al 26 de noviembre de 2016. Véase Anejo 16, Acta 28; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 19.

28. El 18 de noviembre de 2016, las partes otorgaron la cuarta y última enmienda al contrato 2016-000100 otorgando 8 día de extensión de vigencia, llevando el contrato del 18 de noviembre de 2016 a la nueva fecha de vigencia del 26 de noviembre de 2016. Véase Anejo 17, Contrato 2016-000100-D; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 20.

29. La cuarta y última enmienda del contrato se registró el 1 de diciembre de 2016 en la OCPR. Véase Anejo 18, hoja de registro; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 21.

30. El 26 de noviembre de 2016 transcurrió sin que mediara una enmienda escrita extendiendo la vigencia del contrato más allá de dicha fecha. Véase y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 22-24.

31. Al 26 de noviembre de 2016, la parte demandante no había presentado ningún arbitraje de asunto relacionado al contrato. *Id.*, Dec. Jur. Sec. Mun., párr. 25.

32. Al momento de expirar el contrato se había llevado a cabo aproximadamente un 82% de las obras del proyecto. Anejo 20, Certificación #11, última página.

33. El 5 de diciembre de 2016, expirado el contrato, el Municipio recibió un Cambio de Orden 5, firmado por varias partes, incluyendo a la parte demandante, solicitando 9 días de extensión de contrato, para llevarlo a una nueva fecha de vigencia al 5 de diciembre de 2016. Véase Anejo 21, cambio orden 5; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 26-a.

34. El 6 de diciembre de 2016, expirado el contrato, el Municipio recibió un Cambio de Orden 6, firmado por varias partes, incluyendo a la parte demandante, solicitando 11 días de extensión de contrato, para llevarlo a una nueva fecha de vigencia al 16 de diciembre de 2016. Véase Anejo 22, cambio orden 6; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 26-b.

35. El 20 de diciembre de 2016, expirado el contrato, el Municipio recibió un Cambio de Orden 7, firmado por varias partes, incluyendo a la parte demandante, solicitando 18 días de extensión de contrato, para llevarlo a una nueva fecha de vigencia al 3 de enero de 2017. Véase Anejo 23, cambio orden 7; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 26-c.

36. Durante el periodo del 1 de diciembre al 16 de diciembre de 2016, la parte demandante alegó llevar a cabo servicios equivalentes a $253,835.50. Véase Anejo 24, Certificación #12 provista por la parte demandante en el proceso de descubrimiento.

37. Para ello la parte demandante preparó una certificación que no contó con el aval del inspector del proyecto, el supervisor del proyecto, el director de finanzas del Municipio, ni el representante del alcalde. *Id.*

38. Unos días antes, el 12 de diciembre de 2016, la parte demandante, por voz de su presidente Monserrate Méndez Román, reconoció que la obra de construcción se encontraba en un 85% completada, según consultada con sus abogados y contables públicos autorizados. Véase Anejo 25, Carta del 85%; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 27.

39. El 21 de diciembre de 2016, la parte demandante, por voz de Raymond Méndez García y Jaime Méndez Garcia, emitieron carta informando sobre el detenimiento de obra de construcción por falta de pago de la certificación #10 y de la certificación #11. Véase Anejo 26, Carta deteniendo obra del 21 de diciembre de 2016; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 28.

40. El 9 de mayo de 2017, el Municipio pagó $266,976.63 a la parte demandante en relación con la Certificación #11, por trabajos efectuados entre el 24 de octubre de 2016 al 30 de noviembre de 2016. Véase Anejo 27, Payment ID 49260; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 29.

41. El 16 de mayo de 2017, el Municipio pagó $174,231.52 a la parte demandante en relación con la Certificación #10, por trabajos hechos entre el 24 de septiembre de 2016 al 23 de octubre de 2016. Véase Anejo 28, Payment ID 49309; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 30.

42. El Municipio no desembolsó ningún fondo público para el pago de $253,835.50 de la referida certificación #12, que contenía trabajos alegadamente llevados a cabo durante el período del 1 de diciembre al 16 de diciembre de 2016, sin contrato vigente. Véase Anejo 19-b, supra, declaración jurada; Anejo 19-a, Dec. Jur. Sec. Mun., párr. 31.

43. El 10 % retenido por el Municipio o el Banco Gubernamental de Fomento al 30 de noviembre de 2016 en base a los pagos efectuados por los servicios prestados bajo la vigencia del contrato 2016 000100 fue de $176,660.98. Véase Alegación 45 y 55 e la demanda, y la cual el Municipio acepta como cierta.

44. El 8 de marzo de 2019, el Municipio cursó carta a la parte demandante, por conducto del Sr. Richard Méndez, para invitarlo a formalizar un nuevo contrato de construcción, honrando la subasta del 2015, para culminar el proyecto de construcción del Centro de Convenciones, por un monto total de $392,994.49. Véase Anejo 29, Carta 2019/3/8; Anejo 19-a, Dec. Jur. Sec. Mun., párr. 32.

45. El 11 de marzo de 2019, la parte demandante, por voz del Sr. Richard Méndez García, replicó al Municipio, requiriendo como condición a formalizar un nuevo contrato el compromiso por parte del Municipio de pagar $584,399.38, lo cual incluía la totalidad del 10% retenido, y otras condiciones. Véase Anejo 30, Carta 2019/3/11 y condiciones; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 33.

46. El 8 de marzo de 2019, el Municipio respondió a las condiciones de la parte demandante, en síntesis, alegando la inaplicabilidad del pago íntegro del 10% retenido, y disponiendo que se aceptaba devolver $100,000 como pago final de las retenciones hasta el momento hechas. Véase Anejo 31, Carta 2019/3/18; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 34.

47. El 24 de abril de 2019, la parte demandante, por voz del Sr. Jaime Méndez García, mando carta al Municipio protestando y negándose a formalizar un nuevo contrato, por la razón de que se reclamaba el pago íntegro del 10% retenido. Véase Anejo 32, Carta 2019/4/24; y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 35.

48. Al momento de la presentación de la demanda, la parte demandante debía por lo menos, entre $164,330.22 a $248,000.00 en cuantías a los siguientes suplidores por el proyecto del Centro de Convenciones de Manatí:

i. reclamación formulada por MINI MASTERS CONCRETE SERVICES, INC., por la suma de $21,156.59.

ii. reclamación formulada por LIGHTING SOLUTIONS, INC., por la suma de $66,644.11.

iii. reclamación formulada por WALDEMAR ROBLES DBA NCBD FIRE por la suma de $49,362.00.

iv. reclamación formulada por FREIRE por la suma de $3,320.37.

v. reclamación formulada por STEEL SERVICES & SUPPLIES, INC., por la suma de $5,062.09.

vi. reclamación formulada por GRC CORPORATION por la suma de $4,175.58.

vii. reclamación formulada por ACHA TRADING por la suma de $6,838.91.

viii. reclamación formulada por A GARCÍA & CO. por la suma de $21,405.76.

ix. reclamación formulada por ENERGY CONTRACTORS, S.E., por la suma de $67,000.00.

x. reclamación formulada por V & A ROOFING, INC., por la suma de $24,200.00.

Véase Anejo 33, listado de reclamaciones de la aseguradora United Surety & Indemnity Company (USIC); y Anejo 19-a, Dec. Jur. Sec. Mun., párr. 36. Véase alegación 53 de la demanda enmendada.

49.     La parte demandante nunca ha podido certificar al Municipio que ha sido relevado de toda obligación como patrono y haber cumplido con todas sus obligaciones, municipales, estatales y federales, relacionadas al proyecto del Centro de Convenciones de Manatí para recibir el pago del 10% retenido total. Véase Anejo 19 b, supra, declaración jurada. Anejo 19-a, Dec. Jur. Sec. Mun., párr. 37.

50.     Ante la negativa de la parte demandante para culminar la construcción, el Municipio tuvo que elaborar y llevar a cabo una nueva subasta pública el 7 de octubre de 2020. Véase Anejo 19-b, supra, declaración jurada. Véase Anejo 19-a, Dec. Jur. Sec. Mun., párr. 38.

51.     Luego de culminar todo el proceso de subasta pública, ésta fue adjudicada el 18 de diciembre de 2020 a Empresas Project Management Engineering Corporation. Véase Anejo 19-a, Dec. Jur. Sec. Mun., párr. 39.

52.     El Municipio otorgó contrato #2021-000165 para culminar el proyecto del Centro de Convenciones. *Id.*

53.     El Centro de Convenciones fue inaugurado el 23 de marzo de 2023. *Id.*, Dec. Jur. Sec. Mun., párr. 40.

54.     El 5 de junio de 2023, tres meses después de que la obra fuera completada por otro contratista, y tras haber transcurrido seis años y seis meses desde la expiración del contrato, la parte demandante compareció ante este Honorable Tribunal con la demanda de epígrafe. Véase Demanda.

Además, el TPI admitió los siguientes hechos adicionales propuestos por la parte apelada en su oposición:

1. La Cláusula Undécima del contrato establece expresamente que, conforme a la Carta Circular OC-10-07 emitida por el Contralor de Puerto Rico, todas las órdenes de cambio de proyectos u obras de construcción deben ser registradas y enviadas a la Oficina del Contralor de Puerto Rico dentro de los términos de tiempo establecidos por ley. En virtud de esta disposición, "EL CONTRATISTA" se compromete a solicitar con tiempo razonable cualquier solicitud de extensión de tiempo y/o cambio en los trabajos...

2. De acuerdo con la Carta Circular OC-10-07, específicamente en la página 8, párrafo (p), se establece de manera categórica que todas las órdenes de cambio (change orders) constituyen enmiendas a los contratos registrados en la Oficina del Contralor de Puerto Rico (OCPR). La carta circular enfatiza que las órdenes de cambio no son documentos

independientes, sino modificaciones directas a los contratos originales, y, por lo tanto, deben registrarse y cumplir con los mismos términos y requisitos aplicables a cualquier otra enmienda contractual. Además, se establece que las órdenes de cambio en proyectos y obras de construcción, incluso cuando hayan sido adjudicadas mediante subasta o cuando el costo de la obra supere los $2,000.00 sin subasta, deben ser registradas de igual manera como enmiendas contractuales.

3. A pesar de que el Municipio Autónomo de Manatí reconoce la Cuarta Enmienda al contrato como la última enmienda al contrato formalmente reconocida, la realidad es que existieron tres enmiendas adicionales, identificadas como la Orden de Cambio 5, 6 y 7 todas debidamente firmadas en tiempo por todas las partes con competencia.

4. A pesar de que la enmienda al contrato titulada como Orden de Cambio #5 fue debidamente firmada por todas las partes con competencia el 23 de noviembre de 2016, incluyendo a Mr. Méndez Construction Corp. (Contratista), el Ingeniero Melvin Robles (Inspector), la Sra. Ivette Durán Freytes (representante de Desarrollo Económico), el Sr. Armando Miranda Bracero (Director de Finanzas) y aprobada por el Honorable Juan Aubín Cruz Manzano (Alcalde del Municipio de Manatí), el Municipio incumplió con su obligación de registrarla ante la Oficina del Contralor de Puerto Rico.

5. El 2 de diciembre de 2016 MR MÉNDEZ CONSTRUCTION, CORP., redactó una misiva dirigida a Rosalís Rodríguez Zayas, en la que se expresó lo siguiente: "Por este medio se solicita extensión de tiempo para el proyecto de referencia hasta el 16 de diciembre de 2016. Esto debido a que el Ingeniero Diseñador no ha completado los trámites de someter As-Built a la Autoridad de Energía Eléctrica, imposibilitando que se pueda completar la conexión del proyecto. Espero que pueda evaluar esta solicitud favorablemente. Quedo de usted."

6. Dicha misiva fue presentada a solicitud del Municipio Autónomo de Manatí en respuesta a la falta de planos aprobados por la Autoridad de Energía Eléctrica, lo que imposibilitaba la culminación del proyecto.

7. La Orden de Cambio #6 fue debidamente firmada el mismo 2 de diciembre de 2016 por Mr. Méndez Construction Corp. (Contratista), el Ingeniero Melvin Robles (Inspector), la Sra. Ivette Durán Freytes (representante de Desarrollo Económico), el Sr. Armando Miranda Bracero (Director de Finanzas) y finalmente aprobada por el Honorable Juan Aubín Cruz Manzano (Alcalde del Municipio de Manatí).

8. El 15 de diciembre de 2016, las partes competentes procedieron a la firma de la enmienda al contrato titulada Cambio de Orden #7, la cual formalizaba una nueva extensión de tiempo para la finalización de la obra. En dicho documento, se estableció que el contratista solicitaba una extensión de 18 días calendario, debido a que el Ingeniero Diseñador del Proyecto había radicado, el 12 de diciembre de 2016, los planos "As-Built" ante la Autoridad de Energía Eléctrica (AEE) y la Junta Reglamentadora de Telecomunicaciones (JRT) para

su aprobación, pero hasta el momento de la firma de la enmienda, dichos planos aún no habían sido aprobados. Esta circunstancia impedía la culminación de la obra, ya que, sin las aprobaciones de estas agencias, Mr. Méndez Construction Corp. no podía proceder con las conexiones requeridas para finalizar el proyecto.

9. El 16 de diciembre de 2016, Mr. Méndez Construction Corp. envió al Municipio Autónomo de Manatí la Certificación de Pago Número 12, la cual reflejaba los trabajos realizados en el proyecto durante el período comprendido entre el 1 de diciembre y el 16 de diciembre de 2016.

10. Dicha certificación asciende a la cantidad de $253,835.50, reflejando trabajos debidamente ejecutados y certificados conforme al contrato.

11. El 21 de diciembre de 2016, Mr. Méndez Construction Corp. envió una misiva al Municipio Autónomo de Manatí, en la cual notificó su decisión de detener la obra debido a que el Municipio aún no había efectuado el pago correspondiente a las Certificaciones de Pago Número 10 y 11, adeudando al contratista la suma de $441,208.15.

12. Los trabajos realizados bajo la Certificación de Pago Número 10 comprenden las labores efectuadas en el proyecto desde el 24 de septiembre de 2016 hasta el 23 de octubre de 2016, mientras que los trabajos correspondientes a la Certificación de Pago Número 11 abarcan el período comprendido entre el 24 de octubre de 2016 y el 30 de noviembre de 2016.

13. Las Certificaciones de Pago Número 10 y 11 fueron pagadas por el Municipio Autónomo de Manatí el 17 de febrero de 2017.

Establecido lo anterior, al aplicar el derecho, el foro primario concluyó que las Órdenes de Cambio Núm. 5, 6 y 7 fueron debidamente aprobadas por "las personas pertinentes en el Municipio, incluyendo el entonces alcalde", y que, por constituir enmiendas al contrato original, crearon una relación contractual válida entre las partes. A base de ello, rechazó la defensa de inexistencia de contrato vigente y ordenó al Municipio proceder con el registro de dichas órdenes de cambio ante la Oficina del Contralor, dejando pendientes para una etapa posterior las reclamaciones económicas.

En desacuerdo con la determinación del TPI, el 6 de noviembre de 2025, el Municipio presentó una *Moción de Reconsideración de Sentencia Parcial del 22 de octubre de 2025* [11], en la cual señaló que el foro primario erró al validar

---

[11] Entrada Núm. 83 del SUMAC del TPI.

órdenes de cambio que nunca fueron aprobadas por la Junta de Subastas del Municipio, y que además fueron emitidas cuando el contrato ya había expirado. Argumentó que la actuación del entonces alcalde al firmar dichos documentos, sin previa consulta y la aprobación de la Junta, fue *ultra vires* y que su nulidad no podía subsanarse mediante el registro posterior. No obstante, el 13 de noviembre de 2025, el foro primario declaró No Ha Lugar la reconsideración del Municipio.[12]

Inconforme aún, el 15 de diciembre de 2025 la parte apelante comparece ante nos mediante el recurso de epígrafe y plantea los siguientes errores:

> **PRIMERO: EL TRIBUNAL DE PRIMERA INSTANCIA ACTUÓ EN CONTRA DE LOS PRINCIPIOS DE CONTRATACIÓN GUBERNAMENTAL Y MUNICIPAL, AL CONCLUIR QUE UNAS ÓRDENES DE CAMBIO QUE NUNCA FUERON EVALUADAS NI APROBADAS POR LA JUNTA DE SUBASTAS DEL MUNICIPIO CONTRATANTE ERAN VINCULANTES PARA ALTERAR O MODIFICAR UN CONTRATO DE CONSTRUCCIÓN, ADJUDICADO MEDIANTE SUBASTA PÚBLICA.**
>
> **SEGUNDO: EL TRIBUNAL DE PRIMERA INSTANCIA ACTUÓ EN CONTRA DE LOS PRINCIPIOS DE CONTRATACIÓN GUBERNAMENTAL Y MUNICIPAL, AL DETERMINAR QUE UNAS ÓRDENES DE CAMBIO ERAN VINCULANTES PARA EXTENDER LA VIDA DE UN CONTRATO DE CONSTRUCCIÓN SIN QUE MEDIARA UNA ENMIENDA FORMAL AL CONTRATO ANTES DE SU VENCIMIENTO.**

El 15 de enero de 2026 la parte apelada presentó su *Contestación a la Apelación.*

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

## II.

### A. Estándar de revisión aplicable a sentencias sumarias

Como sabemos, la sentencia sumaria es un mecanismo procesal provisto en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36, cuyo fin es proveer una solución justa, rápida y económica de los litigios.

---

[12] Entrada Núm. 84 del SUMAC del TPI.

*Serrano Picón v. Multinational Life Ins.*, 212 DPR 981, 992 (2023); *González Santiago v. Baxter Healthcare*, 202 DPR 281, 290 (2019); *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 109 (2015). A tenor, dicho mecanismo procesal permite que un tribunal, disponga parcial o totalmente de litigios civiles en aquellos casos en los que no exista alguna controversia material de hecho que requiera ventilarse en un juicio plenario y el derecho así lo permita. *León Torres v. Rivera Lebrón,* 204 DPR 20, 41 (2020). La sentencia sumaria procede cuando "no existen controversias *reales* y *sustanciales* en cuanto a *los hechos materiales,* por lo que lo único que queda por parte del poder judicial es aplicar el Derecho". *Meléndez González et al. v. M. Cuebas*, *supra,* pág. 109, citando a *Oriental Bank v. Perapi et al.*, 192 DPR 7 (2014); *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013); *Nieves Díaz v. González Massas*, 178 DPR 820, 847 (2010).

Al interpretar la precitada Regla, el Tribunal Supremo ha expresado que debe dictarse sentencia sumariamente cuando el tribunal sentenciador tiene ante sí, de manera incontrovertible, la verdad sobre todos los hechos esenciales. *ELA v. Cole*, 164 DPR 608, 625 (2005). De manera que, "una controversia de hecho es suficiente para derrotar una moción de sentencia sumaria [...] cuando causa en el tribunal una duda real y sustancial sobre algún hecho relevante y pertinente". *Pepsi-Cola v. Mun. Cidra et al.,* 186 DPR 713, 756 (2012). Se entiende que un hecho material es aquél que puede afectar el resultado de la reclamación acorde al derecho sustantivo aplicable. *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010). Por ello, no se deberá dictar sentencia sumaria cuando: 1) existen hechos materiales controvertidos; 2) hay alegaciones afirmativas en la demanda que no han sido refutadas; 3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material; o 4) como cuestión de derecho no procede. *Pepsi-Cola v. Mun. Cidra, supra,* pág. 757; *SLG Szendrey-Ramos v. Consejo Titulares*, 184 DPR 133, 167 (2011).

Al atender la moción de sentencia sumaria, el Tribunal deberá asumir como ciertos los hechos no controvertidos que se encuentren sustentados por los documentos presentados por la parte promovente. *ELA v. Cole, supra,* pág. 626. No obstante, "la omisión en presentar evidencia que rebata aquella presentada por el promovente, no necesariamente implica que procede dictar sentencia sumaria de forma automática". *Mun. de Añasco v. ASES*, 188 DPR 307, 327 (2013), citando a *Córdova Dexter v. Sucn. Ferraiuoli*, 182 DPR 541, 556 (2011).

A su vez, corresponde al juzgador actuar guiado por la prudencia y ser consciente de que su determinación podría implicar que se prive a una de las partes de su "día en corte", elemento esencial del debido proceso de ley. *León Torres v. Rivera Lebrón, supra,* pág. 44. Cónsono con lo anterior, nuestro más Alto Foro ha resuelto que, existen litigios y controversias que "por su naturaleza no resulta aconsejable resolverlos mediante una sentencia dictada sumariamente; ello, en vista de que en tales casos un tribunal difícilmente podrá reunir ante sí toda la verdad de los hechos a través de affidávits, deposiciones o declaraciones juradas". *Jusino et als. v. Walgreens*, 155 DPR 560, 579 (2001), citando a *Soto v. Hotel Caribe Hilton*, 137 DPR 294, 311 (1994); *García López v. Méndez García*, 88 DPR 363, 379 (1963). Dicho foro ha identificado como posibles controversias de este tipo aquellas que incluyen: "elementos subjetivos, es decir, aquellas en las que el factor credibilidad juegue un papel esencial o decisivo para llegar a la verdad, y donde un litigante dependa 'en gran parte de lo que extraiga del contrario en el curso de un juicio vivo'. *Audiovisual Lang. v. Sist. Est. Natal Hnos.*, 144 DPR 563, 577 (1997).

Al evaluar una moción de sentencia sumaria, el Tribunal de Apelaciones está en la misma posición del Tribunal de Primera Instancia. *Serrano Picón v. Multinational Life Ins.*, *supra*, pág. 993; *Meléndez González et al. v. M. Cuebas*, *supra*, pág. 118. Tómese en cuenta que nuestra revisión es

una de *novo* y debemos basar nuestro análisis por las disposiciones de la Regla 36 de Procedimiento Civil, *supra*, así como de su jurisprudencia interpretativa. A tenor, el Tribunal Supremo ha esbozado los criterios que deben guiar esta revisión. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679-680 (2018); *Meléndez González et al. v. M. Cuebas, supra*, págs. 118-119. Consecuentemente, el Tribunal de Apelaciones debe:

1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario;

2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*;

3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, *supra*, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos y;

4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al., supra*, pág. 679.

Ahora bien, estamos limitados en cuanto a: (1) que no podemos tomar en consideración evidencia que las partes no presentaron ante el foro primario, y (2) tampoco adjudicar los hechos materiales en controversia, ya que ello le compete al tribunal de instancia luego de celebrado un juicio en su fondo. *Meléndez González et al. v. M. Cuebas, supra*, pág. 118. Al realizar nuestra revisión *de novo* debemos "examinar el expediente de la manera más favorable hacia la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario, llevando a cabo todas las inferencias permisibles a su favor". *Id.*

### B. Contratación Gubernamental

Reiteradamente nuestro Tribunal Supremo ha expresado que "la contratación gubernamental se encuentra revestida del más alto interés público, por involucrar el uso de bienes o fondos gubernamentales". *Mun. Aguada v. W. Const. y Recovery Finance*, 2024 TSPR 69, 214 DPR ___ (2024);

*SLG Ortiz-Mateo v. ELA*, 211 DPR 772, 794 (2023); *Demeter Int'l v. Srio. Hacienda*, 199 DPR 706, 729 (2018). Véase, además, *CFSE v. Unión de Médicos*, 170 DPR 443, 452 (2007); *De Jesús González v. AC*, 148 DPR 255, 267-268 (1999). Por ello, las normas que rigen los contratos deben aplicarse con rigor, a fin de salvaguardar los intereses y el patrimonio del pueblo. *Mun. Aguada v. W. Const. y Recovery Finance, supra*; *SLG Ortiz-Mateo v. ELA, supra*; *Demeter Int'l v. Srio. Hacienda, supra*; *CFSE v. Unión de Médicos, supra*; *De Jesús González v. AC, supra*.

A partir de ese marco, no puede pasarse por alto que todo organismo gubernamental está obligado a cumplir fielmente con las disposiciones constitucionales, pues los fondos públicos solo pueden destinarse a fines públicos legítimos. *SLG Ortiz-Mateo v. ELA, supra*; *Demeter Int'l v. Srio. Hacienda, supra*; *Mun. Quebradillas v. Corp. Salud Lares*, 180 DPR 1003, 1017 (2011); *CFSE v. Unión de Médicos, supra*. En consecuencia, el gobierno "no puede actuar de un modo que esté reñido con los principios que encarna el orden constitucional". *Demeter Int'l v. Srio. Hacienda, supra*.

Así pues, nuestro Alto Foro ha determinado que todo contrato gubernamental debe cumplir con los siguientes requisitos: (1) constar por escrito; (2) mantener un registro que establezca su existencia; (3) remitir copia a la Oficina del Contralor de Puerto Rico, y (4) acreditar que se realizó y otorgó quince días antes. *Mun. Aguada v. W. Const. y Recovery Finance, supra*; *SLG Ortiz-Mateo v. ELA, supra*; *Génesis Security v. Depto. Trabajo*, 204 DPR 986, 998 (2020); *ALCO Corp. v. Mun. de Toa Alta*, 183 DPR 530, 537 (2011); *Ocasio v. Alcalde Mun. de Maunabo*, 121 DPR 37, 54 (1988). Dada su importancia, se ha señalado que estos requisitos "sirven como mecanismo de cotejo para perpetuar circunstancial y cronológicamente esos contratos y, así, evitar pagos y reclamaciones fraudulentas". *SLG Ortiz-Mateo v. ELA, supra*, pág. 795; *Génesis Security v. Depto. Trabajo, supra*. Véase, también, *Vicar Builders*

*v. ELA* et al., 192 DPR 256, 264 (2015); *ALCO Corp. v. Mun. de Toa Alta*, *supra*, págs. 537-538.

En cuanto a ello, el Tribunal Supremo ha reiterado en múltiples ocasiones que quienes contratan con entidades gubernamentales sin cumplir con los requisitos legales asumen el riesgo de sus propias pérdidas. *SLG Ortiz-Mateo v. ELA*, *supra*, pág. 796; *Rodríguez Ramos et al. v. ELA et al.*, 190 DPR 448, 461 (2014); *Quest Diagnostics v. Mun. San Juan*, 175 DPR 994, 1002 (2009). Por tal razón, "para evitar situaciones irregulares en las que el Estado termine lucrándose injustificadamente, las partes deberán ser meticulosas al otorgar sus contratos". *Vicar Builders v. ELA* et al., *supra*, pág. 269.

Ahora bien, además de lo anterior, y para cumplir con el mandato constitucional de proteger los fondos públicos, la Asamblea Legislativa ha promulgado diversas leyes que imponen controles fiscales a la contratación gubernamental. *SLG Ortiz-Mateo v. ELA*, *supra*, pág. 795; *Rodríguez Ramos et al. v. ELA et al.*, *supra*, pág. 456; *Jaap Corp. v. Depto. Estado et al.*, 187 DPR 730, 739 (2013).

A tales efectos, la Ley de Municipios Autónomos de Puerto Rico (en adelante, Ley de Municipios Autónomos), Ley Núm. 81-1991, según enmendada, 21 LPRA ant. sec. 4001 *et seq.*[13], confirió a los municipios un mayor grado de gobierno propio y autonomía fiscal. Exposición de Motivos de la Ley de Municipios Autónomos, *supra*. Véase, además, *Muñiz Burgos, Inc. v. Mun. de Yauco*, 187 DPR 665, 675 (2013). La intención legislativa al aprobar este estatuto fue otorgarles a los municipios los poderes y facultades necesarios para asumir un rol activo en su desarrollo urbano, social y económico. *González Meléndez v. Mun. San Juan et al.*, 212 DPR 601, 614 (2023).

---

[13] Si bien esta ley fue derogada por Código Municipal de Puerto Rico, Ley Núm. 107-2020 (21 LPRA sec. 7001 *et seq.*), en este caso son de aplicación las disposiciones de la Ley de Municipios Autónomos de 1991, toda vez que era el estatuto vigente al momento de los hechos.

El Artículo 8.016 de la Ley de Municipios Autónomos, 21 LPRA sec. 4366, establece las normas pertinentes a la otorgación de contratos por el municipio. En lo ateniente a los contratos de ejecución de obras y mejoras públicas, dispone que estos no se suscribirán hasta tanto se cumplan con los requisitos allí establecidos, y, además, que una vez otorgado el contrato este proveerá para una retención de un diez por ciento (10%) de cada pago parcial hasta que termine la obra y ésta sea inspeccionada y aceptada por el municipio y hasta tanto el contratista evidencie que ha sido relevado de toda obligación como patrono. *Id.* Asimismo, el citado Artículo establece la obligación del municipio de mantener un registro de todos los contratos que otorguen, incluyendo las enmiendas a los mismos y enviarán copia de éstos y de las escrituras de adquisición y disposición de bienes a la Oficina del Contralor de Puerto Rico. *Id.*

Conforme la facultad de contratación que tienen los municipios, el Artículo 10.001 de la referida ley dispone, entre otras, que será necesario celebrar una subasta pública cuando el municipio pretenda realizar cualquier obra de construcción o mejora pública por contrato que exceda de doscientos mil (200,000) dólares. 21 LPRA sec. 4501. Así también, el Artículo 10.002, 21 LPRA sec. 4502, establece en qué circunstancias no será necesario anunciar ni celebrar una subasta pública, entre las cuales se encuentran "[l]as alteraciones o adiciones que conllevan un aumento en el costo de hasta un máximo del treinta por ciento (30%) del total del proyecto original en cualquier construcción o mejora de obra pública realizada por contrato. Además, añade el Artículo que:

> "[E]n circunstancias excepcionales debidamente justificadas y documentadas, el Municipio podrá aprobar una orden de cambio que exceda el treinta por ciento (30%) del costo del proyecto original en cualquier construcción o mejora de obra pública mediante la formulación de un contrato supletorio. Cuando exista más de una alteración o adición a un contrato, tales alteraciones o adiciones tomadas en conjunto no podrán exceder el máximo del treinta por ciento (30%) del total del costo del proyecto original y tendrán que ser aprobadas por la Junta de Subastas, salvo que cuando esto ocurra, se otorgue un contrato

supletorio con el voto afirmativo de dos terceras (2/3) partes de las miembros de la Junta de Subastas. Dicho contrato no podrá exceder de un quince por ciento (15%) del costo total del proyecto, incluyendo las órdenes de cambio." *Id.*

Respecto a dichas alteraciones o adiciones, nuestro Tribunal Supremo ha reconocido que: "de ordinario en Puerto Rico el término de una obra se extiende durante su ejecución para subsanar situaciones imprevistas en su etapa de proyección y planos... A tal efecto el Dueño extiende al Contratista Órdenes de Cambio ('*change orders*')." *Levy v. Aut. Edif. Públicos*, 135 DPR 382, 389 (1996). Por ello, corresponde analizar la naturaleza jurídica de las órdenes de cambio y su efecto sobre la vigencia del contrato.

En *Levy*, el Tribunal Supremo reiteró que, en los contratos de construcción, las órdenes de cambio no constituyen documentos independientes, sino que se deben tomar en consideración junto con el contrato original. *Id.*, pág. 390. En ese sentido, nuestro Alto Foro dispuso que: "determinar la intención de las partes exige tomar en consideración no sólo los contratos, 'sino también la práctica de mercadeo en la industria, los actos de los contratantes anteriores, coetáneos y posteriores y quiénes son las partes, *haciendo particular hincapié en el conocimiento especializado que todos o algunos de ellos pudieran tener sobre la materia objeto del contrato*'." *Id.* (Énfasis en el original).

La interpretación del Tribunal Supremo en *Levy* estableció que las órdenes de cambio, previamente contempladas en el contrato original, podían alterar el término originalmente pactado para la ejecución de una obra, ello para atender situaciones imprevistas surgidas durante la fase de diseño o construcción. *Id.*, págs. 390-391. No obstante, en el contexto de la contratación gubernamental y municipal, el carácter de las órdenes de cambio como enmiendas contractuales no las exime del cumplimiento estricto de los requisitos legales aplicables.

A tales efectos, la Carta Circular OC-14-05[14] de la Oficina del Contralor de Puerto Rico dispone expresamente que las órdenes de cambio constituyen enmiendas a los contratos registrados y deben otorgarse y registrarse dentro de los términos establecidos por ley, sin que puedan emitirse válidamente luego del vencimiento del contrato o de su última enmienda vigente. Así también la Ley de Registros de Contratos de 18 de 30 de octubre de 1975 según enmendada, establece que cada entidad tiene la responsabilidad de establecer y mantener su propio registro de contratos, enviar copia de todo contrato a la Oficina del Contralor de Puerto Rico, dentro del término dispuesto en ley, y acreditar que se realizó y otorgó 15 días antes. 2 LPRA sec. 97.

**III.**

El Municipio sostiene, en esencia, dos cosas: (1) que las Órdenes de Cambio 5, 6 y 7 no lo obligan porque la Junta de Subastas no las aprobó, y (2) que tampoco podían extender el contrato porque el contrato ya había vencido. A la luz del marco jurídico aplicable a la contratación gubernamental y municipal y, en particular, a los resuelto en *Levy v. Aut. Edif. Públicos*, *supra*, coincidimos con el foro primario en que las Órdenes de Cambio Núm. 5, 6 y 7 constituyeron enmiendas al contrato original otorgado entre las partes y que corresponde su registro en el Registro de Contratos del Contralor. Veamos.

Del expediente surge que, mientras se desarrollaba el proyecto, surgieron situaciones que impidieron completar la obra dentro del término originalmente pactado. En particular, el récord refleja atrasos ocasionados por las condiciones del tiempo y, posteriormente, por la falta de aprobaciones de las agencias reguladoras, lo que dificultó culminar el proyecto en el término inicialmente establecido en el contrato. Ante esa realidad, las partes

---

[14] Dicha Carta Circular OC-14-05 fue derogada posteriormente por la OC-21-11. Sin embargo, hacemos referencia a ella por ser la normativa vigente a la fecha de los hechos del caso de autos.

acudieron al mecanismo previsto en el propio contrato: las órdenes de cambio.[15]

En ese contexto, la Orden de Cambio Núm. 5, firmada el 23 de noviembre de 2016, cuando el **contrato aún se encontraba vigente**, concedió una extensión de nueve (9) días, fundamentada en atrasos por lluvia, y no supuso un aumento en la cuantía del contrato. Luego, la Orden de Cambio Núm. 6, firmada el 2 de diciembre de 2016, dentro del periodo de vigencia del contrato según la Orden de Cambio Núm. 5, otorgó una extensión adicional de once (11) días, debido a la imposibilidad de preparar y radicar los planos "*As-built*" ante las agencias pertinentes, y tampoco implicó un aumento en la cuantía del contrato. Finalmente, la Orden de Cambio Núm. 7, firmada el 15 de diciembre de 2016, dentro del periodo extendido por la Orden de Cambio Núm. 6, concedió una extensión de dieciocho (18) días, fijando como nueva fecha de terminación del proyecto el 3 de enero de 2017, ante la espera de aprobaciones aún pendientes.

Todas estas órdenes de cambio se limitaron a extender el término contractual, sin implicar aumento en el presupuesto del proyecto. De hecho, el propio récord demuestra que en las órdenes de cambio anteriores que sí conllevaron cambios en la cuantía del contrato, el Municipio sí acudió a la Junta de Subastas y obtuvo su aprobación conforme lo exige la ley. Asimismo, estas órdenes fueron firmadas por el contratista y por funcionarios municipales con autoridad para hacerlo, incluyendo al entonces alcalde.

No obstante, el Municipio sostiene que dichas órdenes carecen de validez porque no fueron aprobadas por la Junta de Subastas. Su planteamiento parte de una interpretación incorrecta del Artículo 10.002(g) de la Ley de Municipios Autónomos, *supra*. Esa disposición requiere acudir nuevamente a la Junta de Subastas **únicamente** cuando una orden de

---

[15] Véase Cláusula UNDÉCIMA del Contrato Núm. 2016-000100 en los Anejos de la *Moción de Sentencia Sumaria* en la Entrada Núm. 59 del SUMAC del TPI.

cambio genera un aumento en el costo del proyecto que exceda el treinta por ciento (30%) del valor del contrato original.

Nuestro parecer es que, en este caso, como no hubo aumento en el presupuesto del proyecto a raíz de las Órdenes de Cambio 5, 6 y 7, no tenía que acudirse a la Junta de Subastas para que esta autorizara el cambio, sino que, con el acuerdo y las firmas de las partes, es decir, el contratista, el director de finanzas, el alcalde, y otros, fue suficiente para considerar que estas órdenes de cambio constituían enmiendas al contrato y, por ende, la extensión de este.

Por otro lado, si bien la normativa aplicable exige que las enmiendas contractuales se registren y que se otorguen antes del vencimiento del contrato, el hecho de que el Municipio no haya completado oportunamente el trámite de registro no puede utilizarse para desconocer por completo órdenes de cambio que fueron aprobadas por sus propios funcionarios y que reflejan la intención de las partes de extender la relación contractual. Esa omisión administrativa es atribuible al propio Municipio. Además, el incumplimiento con lo dispuesto en el Artículo 1 de la Ley 18-1975 o con la disposición equivalente relacionada a registros de contratos incluidos en el Artículo 8.016 de la Ley 81-1991, según enmendada, conocida como "Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico" de por sí no será causa para que un Tribunal competente declare la nulidad de cualquier contrato o negocio jurídico legalmente válido.

En estas circunstancias, el foro primario actuó correctamente al concluir que las Órdenes de Cambio Núm. 5, 6 y 7 constituyeron enmiendas al contrato original, y al ordenar al Municipio proceder con su registro, dejando para una etapa posterior la adjudicación de las reclamaciones económicas y las defensas relacionadas. En consecuencia, corresponde confirmar la *Sentencia Parcial* apelada.

**IV.**

Por los fundamentos antes expuestos, *confirmamos* la *Sentencia Parcial* apelada.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones